HILTON ACRES, A NEW JERSEY CORPORATION, E'DOR BUILDING CORP., *ETC.*, *ET AL.*, PLAINTIFFS-APPEL-LANTS, *v.* JOHN N. KLEIN, MAYOR OF THE TOWNSHIP OF ROXBURY, NEW JERSEY, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF ROXBURY, PLANNING BOARD OF THE TOWNSHIP OF ROXBURY, ANTHONY LEONARD, BUILDING INSPECTOR OF THE TOWNSHIP OF ROXBURY, DEFENDANTS-RESPONDENTS.

Argued September 14, 1961—Decided October 23, 1961.

572

*Mr. Frank C. Scerbo* argued the cause for plaintiffs-appellants (*Mr. Scerbo,* attorney; *Mr. Herbert S. Glickman,* on the brief).

*Mr. John R. Miller* argued the cause for defendants-respondents (*Messrs. Barrett and Miller,* attorneys; *Mr. Miller,* on the brief).

The opinion of the court was delivered by

HALL, J. This is a land subdivision regulation case. It is here on certification of the judgment of the Appellate Division, 64 *N. J. Super.* 281 (1960), granted on plaintiffs' petition. 34 *N. J.* 329 (1961).

Fundamentally involved are two abstract legal questions arising under the Municipal Planning Act of 1953. *N. J. S. A.* 40:55–1.1 *et seq.* Both are novel, but concern the same basic considerations in construing the statute which we set forth in *Levin v. Township of Livingston,* 35 *N. J.* 500 (1961), handed down after the Appellate Division had decided this case.

The first question is whether the minimum lot size required by the local zoning ordinance at the time of tentative approval of the subdivision is a "general term or condition" thereof. The act, *N. J. S. A.* 40:55–1.18, provides that such approval shall confer upon the developer the "right," for a three-year period, "that the general terms and conditions upon which the tentative approval was granted will not be changed." The Appellate Division answered the question in the affirmative, which was in plaintiffs' (the developers') favor.

The second is whether the three-year period may be extended by the municipality. The statute is silent. The local subdivision ordinance authorized the planning board to extend without limit of time, with consequent continued protection to the subdivider. It was held below that no

power to extend existed and that the ordinance provision was consequently void—a result favoring the municipality, which plaintiffs claim was erroneous.

A third question is also present—whether, by reason of the peculiar circumstances of the case, plaintiffs are entitled to any relief from the effect of *ab initio* invalidity of the extension of tentative approval here granted. This issue was decided essentially against the developers by the Appellate Division. A sketch of the factual setting is necessary to make the problem clear.

In June 1956 plaintiffs received tentative approval from the Roxbury Township Planning Board for a large residential development in a rural area. The board possessed full, and not merely recommendatory, power under the ordinance. Approval was expressly made subject to a rather obscure condition, which we will mention more fully later, relating to sanitary sewage disposal. The 254 lots on the plat conformed to the then zoning ordinance requirement of 15,000 square-foot minimum size. The zoning ordinance was amended in November 1956 to require a 30,000 square-foot minimum. Few, if any, of the lots met this minimum. The requirement has been further increased since the commencement of the litigation.

Progress of the development appears to have been slow. In November 1957 the board granted what amounted to final approval for three lots for the purpose of erecting model homes. These were located on the existing highway, which crossed a corner of the tract, at the intersection of a proposed new street leading into the interior. Two such houses were later built, but construction did not commence until September 1958. One of them has since been sold. In July 1958 final approval was voted with respect to some 17 lots fronting on the highway, referred to as Section 1, but plaintiffs never took the necessary perfecting steps and concede it never became effective.

In October 1958, when the original tentative approval still had eight months of its three-year life yet to run,

plaintiffs requested, and the board allowed, an extension thereof until October 1961. In May 1959 final approval was granted as to 25 more lots, called Section 2. These were located on proposed new streets running into the interior of the tract from the location of the model homes. Approval was made subject to plaintiffs' furnishing a bond guaranteeing the installation of improvements required by the subdivision ordinance (streets, street signs, monuments, culverts and storm sewers). The bond had not been fixed in amount or supplied, and so final approval was not complete when the planning board advised plaintiffs on June 7 that its action had been in error because the amended zoning ordinance required lots of a 30,000 square-foot minimum area. This date, purely coincidentally, was exactly three years after the grant of tentative approval, marking the expiration of the statutory period of guarantee against changes in "general terms or conditions." Until this action it does not appear that any question had ever been raised as to the right of plaintiffs to complete the development on the 15,000 square-foot lot size shown on the plat given tentative approval, despite the zoning ordinance upgrading in November 1956. All the applications referred to had been on the basis of lots of that area.

This revocation precipitated the litigation commenced very shortly thereafter. As of that time there had been no building on the tract except the two model homes and little physical preparation of the land beyond the clearing and grading of one of the proposed streets for a relatively short distance and rather minor commencement of some drainage work. Almost all of the 123-acre tract remained in its virgin state.

The pleadings really raised only the first question, *i. e.,* whether a zoning ordinance requirement as to minimum lot size was a "general term or condition" not subject to change for the three-year period. Based on the affirmative of that proposition, the complaint sought, in effect, the setting aside of the revocation of final approval as to Section 2, the

issuance of building permits for those lots after the performance bond for improvements was furnished, and a declaration that plaintiffs were entitled to complete the development on the basis of lots of a 15,000 square-foot minimum despite the zoning ordinance amendment. Defendants' answer took the flat position that a developer is obliged to conform to all minimum lot size changes, no matter when made, *i. e.,* that this is not "a general term or condition" within the meaning of the statute. Both sides moved for summary judgment in the Law Division. Defendants' motion was granted.

The validity of the extension of tentative approval was not questioned by anyone until the Appellate Division posed the issue on its own motion at the oral argument of plaintiffs' appeal. The matter was pertinent to the demand for declaratory relief with respect to the vast area of the development for which final approval had not yet been sought. It also bore on plaintiffs' status concerning Section 2 where final approval had been voted but not perfected prior to the expiration of the original three-year period. In the supplemental briefs submitted, the municipality took the position that the planning act did not empower any extension of tentative approval and so its ordinance permitting such was invalid. Plaintiffs not only urged the contrary on this legal question, but also alternatively contended that their deliberation in proceeding with the development was a result of their reliance on the extension, which they believed gave them until October 1961 to obtain final approval of the balance of the tract. Thus they sought to retain the benefit of the extension on the theory of estoppel, particularly since the township granted it in accordance with its own ordinance and never questioned its own power to do so until the point was raised by the appellate court. To support their reliance claim factually, plaintiffs pointed to affidavit proofs specifying work done and expenditures made or committed which they had submitted to the trial court to ground an analogous contention in connection with the

question of whether the statutory "general terms and conditions" included minimum lot size.

As we have indicated, the Appellate Division decided that the enabling act did not authorize any municipal extension of the benefits of tentative approval beyond the statutory period of three years and that the ordinance provision was void. It further held that plaintiffs could consequently take no benefit from it as matter of law, irrespective of any reliance in fact, and that, in any event, the proofs did not establish substantial expenditures on the strength of the extension. The court did reverse the trial court judgment with respect to Section 2 and remanded that phase for a plenary trial to determine whether plaintiffs' status and rights with respect thereto, as of the date of revocation of final approval and the coincident expiration of the three-year period, had been perfected so as to require that they be permitted to proceed with building on 15,000 square-foot lots in that section.

Plaintiffs here challenge all these conclusions and say that they are entitled to judgment according to the prayers of the complaint as matter of law. In the alternative they urge that, if the case is to turn on the issue of reliance and their present proofs thereon are deemed insufficient, the case should be remanded to the trial court for a full hearing on that phase, since the affidavits were originally submitted on a different aspect and not with the instant problem in mind. At the least, they claim they should be entitled to enjoy the benefits of the minimum lot size permitted at the time of tentative approval for a period representing the eight months which remained of the original three years when the extension was granted, such period to commence from the date of the decision of this appeal.

█ █ Reverting to the first question, defendants did not seek to cross-appeal from the holding of the Appellate Division thereon. Its conclusion that zoning ordinance minimum lot size is a "general term or condition" of tentative approval, statutorily protected for three years from the date thereof

against change with respect to the particular development, therefore stands unchallenged. We nonetheless believe, in view of the importance of the question, that we should express our view thereon as the court of last resort. We find ourselves in thorough agreement with the result reached on this issue and with the reasons expressed by Judge Conford in his opinion. 64 *N. J. Super.*, at *pp.* 290–295. This leads to an affirmance of the conclusion that the planning board was not justified in revoking its grant of final approval of Section 2 by reason of the upgrading of the zoning ordinance lot size requirement after the allowance of tentative approval.[1]

Likewise we are in agreement with the Appellate Division's answer to the second question. We are convinced beyond any doubt that the Legislature clearly did not intend to permit any municipal extension of tentative approval beyond the three-year term provided in the statute. Plaintiffs' contrary arguments were also made below and were effectively shown to be unpersuasive by Judge Conford. 64 *N. J. Super.*, at *pp.* 295–296. In addition, we may point out, from the historical aspect, that the Roxbury subdivision ordinance, adopted in 1954, substantially follows the pattern of a model or guide ordinance (*Land Subdivision in the State of New Jersey, A Guide to the Preparation of Municipal Land Subdivision Control Ordinances* (1954)), prepared by the Division of Planning and Development of the State Department of Conservation and Economic Development after the passage of the 1953 Planning Act for the assistance of municipalities in drafting appropriate individual ordinances to implement and conform to the enabling statute. That model contained no provision allowing the extension

---

[1] The views just expressed must be considered as limited to protection against zoning ordinance changes within three years of *tentative* approval. We do not here reach the question of the period of effectiveness of *final* approval against ordinance changes subsequent to it. See some discussion thereon in *Levin, supra* (35 *N. J.*, at *pp.* 518–519).

of tentative approval. Roxbury appears to have devised and incorporated such a permission as its own thought.

The conclusions expressed have an even deeper foundation when the questions are more broadly viewed in the light of the philosophy and scheme of subdivision regulation found in the planning act, which we discussed in *Levin* (35 *N. J.* 500). Those considerations have pertinency as well to the resolution of the third query.

The statute prescribes in considerable detail—much more so, for example, than in the zoning enabling law—the scope, manner and procedure of permissible local regulation. The 1953 act goes much further in this regard than the original statute or its amendments. It follows irresistibly that "the implementary provisions of the ordinance must be confined within the framework and reasonable intendment thereof. The municipality may not, on the one hand, go beyond the fair limitations of the act, nor may it, on the other, validly impose lesser or contrary requirements than are minimally called for." 35 *N. J.,* at *pp.* 507–508.

Evident throughout the statutory provisions is legislative evaluation of the competing interests involved in land subdivision—the broad public interest and the personal concerns of the prospective individual home purchaser, the adjacent land owner and the developer. There cannot be the slightest doubt of a basic philosophy that the public interest in all its ramifications, both present and future, shall be paramount. This approach will at the same time also largely protect the interests of the subsequent individual vendee and adjacent owners. See, for instance, the provisions setting forth the many "conditions in the public interest" to be required by the planning board in acting upon plats at inception (*N. J. S. A.* 40:55–1.20) and the numerous improvements which the local ordinance may specify for installation or guarantee by the developer in all cases before his plat may be finally approved for filing, building and lot sale (*N. J. S. A.* 40:55–1.21 and 1.22).

On the other hand, consideration of the developer's interest, consonant with protection of the great public stake, is found in the provisions permitting advance determination of the conditions deemed requisite for the particular subdivision by the tentative approval procedure (employed in practically all ordinances) and the guarantee against change therein for a period of three years (*N. J. S. A.* 40:55–1.18). In addition, he knows from the ordinance the improvements, otherwise the responsibility of the municipality or the ultimate individual owners, which he must provide and pay for.

The overall procedural scheme is plain. The board must, after a public hearing on notice to all interested parties (*N. J. S. A.* 40:55–1.7), thoroughly consider, on the application for tentative approval, all aspects of the particular development and reach conclusions thereon in detail from the standpoint of the public interest. These constitute the "rules of the game" upon which the developer is entitled to rely for three years. He is thus assured a reasonable length of time to decide whether to proceed, and if he does, then time in which to prepare for final approval and completion of the project. Lot size being so fundamental, it is difficult to conceive of any aspect which is any more appropriately encompassed within the classification of "general terms or conditions" and therefore fixed, to the developer's advantage, for the three-year period.

The paramount nature of the public interest dictates the further conclusion that the Legislature could not have intended conditions imposed at inception to be considered as frozen indefinitely. The municipal authorities may well decide, by reason of experience, population growth or for any number of other valid reasons, that requirements should be upgraded, as, for example, by increase of lot size minima in the zoning ordinance to lessen population density. The Legislature certainly appreciated the importance of such possibilities and so must be said to have specified the three-year protective period for the developer's benefit as an out-

side limit. This is made especially clear by the absence of any provision allowing an extension of tentative approval as contrasted with numerous instances where enlargements of specified time periods are expressly permitted by the statute.

Viewing the enabling act as a whole, one must conclude that the Legislature went into considerable detail to set forth what municipalities may and may not do in subdivision regulation, not merely for the sake of providing inter-municipal uniformity, but more fundamentally to declare a strong policy that the public interest shall always be the paramount concern of local agencies.

This leads us to the third question—the matter of the situation of these particular plaintiffs by reason of the invalid extension of tentative approval. The Appellate Division held that, since the extension provision was void for lack of municipal power and in contravention of the enabling statute, plaintiffs were not entitled to the benefit of it.

This conclusion rests on established and eminently sound law. Our cases have consistently held that municipal action in the land use control field taken in direct violation of law or without legal authority is void *ab initio* and has no legal efficacy. So a building permit issued contrary to a zoning ordinance or building code cannot ground any rights in the applicant. Representative decisions are *Giordano v. Dumont,* 137 *N. J. L.* 740, 742–743 (*E. & A.* 1948); *Saddle River Country Day School v. Saddle River,* 51 *N. J. Super.* 589, 605–607 (*App. Div.* 1958), affirmed on opinion below, 29 *N. J.* 468 (1959); and *Esso Standard Oil Co. v. North Bergen Township,* 50 *N. J. Super.* 90, 95–96 (*App. Div.* 1958). Nor, *a fortiori,* may a property owner, by unilateral action, secure a valid nonconforming use based on a violation of the zoning ordinance. *Universal Holding Co. v. North Bergen Township,* 55 *N. J. Super.* 103, 111–112 (*App. Div.* 1959). These authorities expressly hold that no estoppel may arise against the municipality in such situations by reason of reliance on the part of the property

owner or of acquiescence and laches by the municipality. This result derives from a recognition of estoppel as a vehicle for a just solution, involving a weighing of the particular interests and equities. Where the action is without any legal warrant, there is a lack of equity in the owner and the public interest completely predominates. The principle is equally applicable to unlawful extension of tentative approval of a land subdivision.

Plaintiffs contend, however, that such a result should not obtain here because both they and the planning board acted in good faith pursuant to the express terms of the ordinance and neither had any idea an extension of tentative approval was not entirely proper. They urge instead application of a line of cases, the latest of which is *Tremarco Corp. v. Garzio,* 32 *N. J.* 448 (1960). The decisions relied upon all involve a building permit valid under the zoning ordinance when issued and a subsequent revocation coincident with or in anticipation of an ordinance amendment which would prohibit the previously permitted use—*i. e.,* a voluntary governmental change of the rules in the middle of the game. In such cases there are equities both ways and the particular circumstances will determine the result. The initial municipal action was valid when taken and so not against the public interest. The extent of the land owner's reliance thereon before the public interest gained the ascendancy by the ordinance change is therefore a most important, and often controlling, factor. The difference from the situation at bar is obvious. The public interest here was paramount throughout and must prevail.

Plaintiffs further urge the suggestion of the trial court opinion in *Jantausch v. Borough of Verona,* 41 *N. J. Super.* 89 (*Law Div.* 1956), affirmed 24 *N. J.* 326 (1957), that an estoppel might arise where a local official honestly issues a building permit for a use debatable under the zoning ordinance, which is substantially relied on by the applicant before attack. The analogy asserted is that the township governing body acted similarly in providing for extension

of tentative approval in the subdivision ordinance, that the planning board did likewise in granting this extension and that plaintiffs relied thereon in pacing the subsequent steps in the development. A vital distinction exists, however, which harks back to what we have said concerning the strong and important public policy inherent in the planning act. Municipal hands are not to be tied or the supremacy of the public interest frozen by tentative approval of a subdivision for longer than a three-year period. The importance to the whole community of such an enterprise far overshadows a mere question of whether, as in *Jantausch,* a beauty parlor in a garage annexed to a dwelling conforms to a permitted zoning classification of a home occupation incidental to residence use. Apart from the difference in degree of the public interest involved in the two cases, the distinction at its root is as broad as that between the unlawful exercise of a local legislative function establishing a policy for those governed and a single administrative determination substantively in error but not, as a governmental act, beyond the authority of the acting official. This difference, of course, is immaterial to the aggrieved relying party. It is, however, of determinative significance in the protection of the public interest, which must be the first concern of the judiciary.

But we do think there is merit to plaintiffs' contention that in any event they should still have an eight-month period in which to seek final approval, *i. e.,* that portion of the three-year period that remained when the extension was allowed. (It does not appear that this alternative was urged to the Appellate Division.) Again we have involved a balancing of interests, but on a narrower scale. If the extension had not been granted in October 1958, plaintiffs would have known that all rights accruing from tentative approval were to expire in June 1959 and they would have undoubtedly speeded their pace accordingly. It can be safely assumed that they acted much differently in view of the extension. In effect, they gave up what the statute granted them as a right, namely, the eight months' remainder of

the three-year protective period, in exchange for a new three-year term which turned out to be illusory. While the broad public interest is so strong that the municipal right to challenge the extension in its entirety cannot be denied, plaintiffs do have a sufficient equity under the circumstances to be remitted to the position in which they would have been had the extension been denied, as it should have, with "time-out" for the period the matter was being threshed out in this litigation. Therefore, the efficacy of the original tentative approval is held to continue for eight months from the coming down of our mandate.

This disposition makes unnecessary the remand directed by the Appellate Division for a determination of the status of Section 2 as of the date of expiration of the three-year period since perfection of final approval of that section may now be had within the ensuing eight months. We should, however, make some comment on the factors which were mentioned below in that connection (64 *N. J. Super.*, at *pp.* 299–301), since similar problems will probably arise upon applications for final approval of additional sections as well as in connection with completion of approval of Section 2.

The discussion we are concerned with arose because of a contention by defendants in the Appellate Division that plaintiffs were not entitled to final approval status of that section in any event because they had not complied with conditions previously imposed by the board. First, final approval of the section was made subject to the furnishing of a bond guaranteeing the installation of improvements required by the ordinance and this security had not been supplied when approval was revoked. Apparently the board intended that the cost of such improvements would be estimated by the township engineer and that the bond would thereafter be filed in that amount without further board action. This delegation of responsibility seems contrary to the provisions of this particular ordinance. While the engineer is required to furnish an estimate, the ordinance is

specific that the amount of the bond shall be fixed by the board itself within a range of the engineer's estimate and 120% thereof. The intent is to vest discretion in the board which cannot be exercised unless it makes the decision as to the amount of the bond after receipt of the estimate. This still remains to be done as to Section 2.

Secondly, and more important, tentative approval of the entire tract was made conditional—"subject to percolation test to establish the advisability of a disposal plant." Defendants contended that such tests had never been furnished nor had the overall manner of sewage disposal been settled. Thus, they said, effective final approval and the issuance of building permits must await determination of the whole sewage disposal matter. Plaintiffs took the position, apparently based on some alleged subsequent understanding, that the problem was to be met on an individual-lot basis by the furnishing of a percolation test as to each lot when a building permit was sought for it. This would call for a separate determination by the township board of health in each instance as to the suitability of the particular lot for septic tank disposal, in accordance with the requirements of the Realty Improvement Sewerage and Facilities Act (1954) (*N. J. S. A.* 58:11–23 *et seq.*).

The Appellate Division found the record so sparse and confusing on the subject that it could come to no conclusion. It did infer from the record that some kind of an accord must have been subsequently reached since the final approval of Section 2 and the abortive action relating to Section 1 made no reference to the matter. We are in agreement. Nonetheless, the subject is so important from the public standpoint that, if it has not already been settled by the board, it will have to be taken up and a proper conclusion reached on the whole matter when the next application to grant or complete final approval is made. Because of the apparent practicalities of the situation and the further eight-month period allowed, we do not find it neces-

sary to require a remand for judicial resolution of the problem.

By way of general observation, we may say that the matter of sewage disposal in a large development in a municipality without any public sewer system, as here, must be determined in a most thorough and careful manner. The importance of effective and safe sewage disposal need not be labored. It is well known that failure of local planning authorities to insist in the beginning on an adequate disposal method in the light of the soil characteristics and topography of the particular tract, as well as sufficient facilities to care for the allied problem of water drainage, is more responsible for later subdivision difficulty and municipal expense than any other deficiency. See *Ardolino v. Florham Park Board of Adjustment,* 24 *N. J.* 94, 108–109 (1957). The planning act therefore wisely specifies that a planning board, in acting on plats, *"shall require,* among other conditions in the public interest, that *the tract* shall be adequately drained * * * [and] that *all lots* shown on the plats shall be adaptable for the intended purposes without danger to health or peril from flood, fire, erosion, or other menace." *N. J. S. A.* 40:55–1.20. (Emphasis supplied) As we said in *Levin,* this inquiry and determination of suitability, with conditions to be met to assure it, is to be made, overall, at inception—on the application for tentative approval—for the proper protection of the public interest as well as to enable the developer to discern with particularity what he must do. 35 *N. J.,* at *pp.* 510–511. See also *Kotlarich v. Ramsey,* 51 *N. J. Super.* 520, 531–532 (*App. Div.* 1958).

The Roxbury ordinance seeks to aid the accomplishment of these statutory requirements by specifying that percolation tests shall be made by the developer and the results submitted with the preliminary plat. (The language of the state-prepared guide ordinance was used.) Obviously this was not insisted upon by the board here and the overall manner of sewage disposal was not decided definitely at the time and as a prescribed term of tentative approval, as it

should have been. Parenthetically it may be noted that the statutory requirement is not met merely by avoiding decision on the question at the tentative-approval stage and leaving it to individual-lot determination when a building permit is applied for. While tests of single lots might produce for each lot a passable result, the characteristics of an area could be such that septic tanks installed in all of the lots therein would prove quite inadequate. However, defendants have not contended that the tentative approval granted was void as a result of the deficiencies mentioned and we are not called upon to decide that question, even if it could be an appropriate contention under the instant circumstances. But the irregular way in which the matter appears to have been handled dictates, as we have said, that, if it has not been properly settled on some undisclosed basis, it must be in conjunction with the next application relating to final approval.

Plaintiffs are entitled to a declaration that the efficacy of the original tentative approval shall continue for a period of eight months from the coming down of our mandate. Effective final approval of Section 2 is incomplete, but the remand ordered by the Appellate Division is unnecessary. Its judgment is modified accordingly and in all other respects affirmed. No costs to any party.

*For modification*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANE-MAN—7.

*Opposed*—None.