72 N.J. Super. 344 (1962)
178 A.2d 348
WILLIAM PURICH, PLAINTIFF-RESPONDENT,
v.
IRVING WEININGER, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued December 11, 1961.
Decided February 23, 1962.
*345 Before Judges GAULKIN, KILKENNY and HERBERT.
Mr. James A. Major argued the cause for appellant (Messrs. Major & Major, attorneys, Mr. James A. Major, II, on brief).
Mr. William R. Morrison argued the cause for respondent (Messrs. Morrison, Lloyd & Griggs, attorneys).
The opinion of the court was delivered by HERBERT, J.S.C. (temporarily assigned).
A contract to buy and sell real estate is the basis of this case. It is dated May 16, 1960, describes two tracts of land in Woodcliff Lake, Bergen County, and names the plaintiff as purchaser and the defendant as seller. Title was closed on the lands designated as the second tract in the contract, and we are now concerned only with the first tract.
When title to the first tract was not closed on time the plaintiff sued in the Law Division for a refund of $12,500 which he had paid on account of the specified purchase price of $112,000. The answer of the defendant denied that he was obligated to pay any refund and alleged that he had been prepared to deliver a deed and accept the balance of *346 the price at the time and place which the plaintiff had fixed for closing title. There followed an allegation that the plaintiff, at the appointed time and place, had neglected and refused to carry out the contract. The defendant also counterclaimed for specific performance or, in the alternative, damages; but this counterclaim, we are told by counsel, was dismissed voluntarily without prejudice.
After the counterclaim had been dismissed, there was a motion for summary judgment by the defendant. It was supported by affidavits and the contract between the parties, as well as by a certified copy of a resolution of the Planning Board of Woodcliff Lake, adopted October 24, 1960. Having heard the defendant's motion, the judge of the Law Division suggested that the case might be treated as though both parties had sought summary judgment. Counsel having so stipulated, the matter was given further consideration and a judgment was entered against the defendant for $12,500.
The basis for the judgment was a conclusion by the judge of the Law Division that the defendant was obligated to procure, before the closing of title, preliminary approval of the Planning Board of the Borough of Woodcliff Lake for a proposed subdivision of the property into building lots and had failed to meet that obligation. On appeal the defendant now contends that the Law Division erred, both in determining that there was an obligation to get planning board approval and that such approval had not in fact been obtained.
Before consideration of the obligation to procure approval from the planning board it should be noted that this is not a case in which the seller was to convey part of an existing unit of land to the buyer and therefore needed official sanction for a subdivision to be created by the intended conveyance. It was conceded at the oral argument that the first tract as held by the defendant was a unit already subdivided from any larger tract of which it had ever been a part. What we are concerned with here is planning board *347 approval as a basis for carrying out a plan to cut up the first tract into building lots after transfer of the title.
As to the existence of an obligation to get planning board approval, the wording of the contract, standing alone, would leave some doubts. The contract contains no clear-cut definition of the approval to be obtained and no direct statement that the seller (the defendant) had to obtain it before the plaintiff would be required to close title. There is language in the document, however, from which an obligation may be inferred. Then, in addition, we have the fact that the parties treated the contract as though requiring planning board approval as a prerequisite to the closing of title.
Inferences that the defendant had to obtain, at or before the closing, a valid approval from the planning board may be drawn from these provisions:
(a) Near the beginning of the document it is provided that the seller will convey "free from all encumbrance * * * on or about September 1, 1960 and within 30 days after preliminary subdivision approval * * *";
(b) Another provision makes the seller responsible for "all engineering costs and fees" but with fees and costs pertaining to a performance bond to be paid by the purchaser;
(c) Finally, there is a sentence reading, "There is no representation that there are 25 building plots in First Tract but both parties shall cooperate in securing 25 plots and Seller represents that he has already presented a map to the Planning Board setting forth 25 plots in First Tract."
By the language quoted above in subparagraph (a) the parties established subdivision approval as one of the factors controlling the closing date. What they intended by the phrase "preliminary subdivision approval" can be clarified by referring to N.J.S.A. 40:55-1.18, L. 1953, c. 433, p. 2178, § 18, which provides in part:
"The governing body or the planning board, as the case may be, may tentatively approve a plat showing new streets or roads or the *348 resubdivision of land along a mapped street. This tentative approval shall confer upon the applicant the following rights for a 3-year period from the date of the tentative approval:
(1) that the general terms and conditions upon which the tentative approval was granted will not be changed.
(2) that the said applicant may submit on or before the expiration date the whole or part or parts of said plat for final approval.
The final approval by the governing body or the planning board, as the case may be, of a plat showing a new street or the resubdivision of land along a mapped street shall expire ninety days from the date of such approval, unless within the period such plat shall have been duly filed by the owner or his agent with the county recording officer. The governing body for good cause shown may extend the time for plat filing for a period not to exceed ninety days."
Although the statute uses the phrase "tentative approval" and the contract, as noted above, speaks of closing title "within 30 days after preliminary subdivision approval," we conclude that the parties contemplated official action under section 1.18, which, upon being perfected, would create in the property owner statutory rights for a three-year period with respect to future subdivision of the first tract into building lots.
The contract provision making the seller responsible for engineering costs and fees is significant. Preparation of a subdivision plan requires that engineering work be done. The seller's representation, quoted above in subparagraph (c), shows that he had at least been responsible for starting that work because he had filed a map with the planning board before the agreement to sell to the plaintiff was even signed. Had it been intended that the seller would pay for all engineering work which the plaintiff might commission in order to get a subdivision approved, would there not have been a maximum figure stipulated or some other control device provided to protect the defendant? We think so, and as a result are led toward the conclusion that the parties intended the necessary engineering services would be arranged for by the defendant and that he would pay the expenses he had already incurred and such additional ones as he might have to incur in order to give *349 the planning board the engineering data it might require before voting "tentative approval" under the statute. He was not issuing a blank check; he was going to do the spending himself.
To say that the actual construction of the roads and sewers of the subdivision will also mean very substantial engineering expense is not valid criticism of the significance which we attach to the express obligation of the seller to pay. The "tentative approval" provided for by section 1.18, supra, is a definite stage of a planning board's work and also of the engineering. Here it was not contemplated that the defendant would be responsible beyond that stage but only up through it. The provision that the plaintiff pay for a performance bond is indicative of an intent that he, after taking title, would be responsible for all costs beyond the stage of tentative approval.
The sentence from the contract which is quoted above in subparagraph (c) is noteworthy. It refers to 25 building plots in such a way as to show that the plaintiff wanted advance assurance he would get that number, or approximately that number, out of the tract. Although a reading of the sentence alone would not indicate whether seller or buyer should obtain tentative approval from the planning board, there is a strong inference that approval was to be obtained before closing. There would have been no point in the agreement that "both parties shall cooperate in securing 25 plots" if it had been the intention to leave the plaintiff to his own devices in getting tentative or preliminary approval from the planning board after he took title.
The indications found in the language of the contract of an obligation to get official approval before closing are reinforced by the conduct of the parties. As mentioned, the contract of May 16, 1960 expressly represents that the defendant on or before that date had presented to the planning board a map delineating a development of 25 lots. Later, when the plaintiff through his attorney gave a notice making time of the essence and fixing October 31, 1960 *350 as the date for closing, the defendant and his attorney attended at the appointed place with a deed and with a certified copy of a resolution adopted October 24, 1960 by the Planning Board of Woodcliff Lake. That resolution recites that the defendant "has duly made application * * * for the preliminary approval of the subdivision" of the first tract, "all as shown on the preliminary map of Paul Scott Acres dated August, 1960, as revised October 19, 1960, prepared by Kanger Engineering Associates, Engineers & Surveyors." The dates of the map, as given in this recital, indicate that the defendant, between the date of the contract and the board's resolution of October 24, 1960, had been working on the problem of getting approval for the future subdivision of the piece of land which he had contracted to sell. Though the affidavit which he filed in support of his motion for summary judgment denies that he was obliged to procure planning board approval, no question is raised in that affidavit about his prosecuting the application before the board as recited in the resolution.
That the defendant took a certified copy of the board's resolution to the place of closing on the appointed date is also indicative of his recognition that official preliminary or, as the statute says, tentative, approval of the proposed subdivision scheme was to be obtained by him before closing. And at the unsuccessful closing conference (though the affidavits are not as descriptive as they might be) it appears that negotiations broke down over the sufficiency of subdivision approval rather than over any question about the need for such approval as a condition precedent to the closing of title.
Doubts about the existence of an obligation or requirement to obtain, before closing title, preliminary or tentative approval of future subdivision from the planning board that might be left after reading the language of the contract between the parties, are eliminated when their subsequent conduct  especially the conduct of the defendant described above  is considered. If the terms of a contract *351 are ambiguous, the practical interpretation of the parties, manifested by their conduct, is entitled to great weight in determining meaning. Journeymen Barbers, etc., Local 687 v. Pollino, 22 N.J. 389, 395 (1956); Macfadden v. Macfadden, 49 N.J. Super. 356, 360 (App. Div. 1958), certification denied 27 N.J. 155 (1958); Michaels v. Brookchester, Inc., 26 N.J. 379, 388 (1958).
We conclude that "tentative approval" by the Planning Board of Woodcliff Lake was required by the contract between the parties as a condition precedent to the closing of title and that the obligation to procure such approval was the defendant's. This brings us to the question of whether that obligation was performed.
The deed offered by the defendant on October 31, 1960 was refused by the plaintiff on the ground that tentative subdivision approval had not actually been obtained. To evaluate this rejection we must examine the resolution which the planning board adopted on October 24, 1960. At the outset we note that the letter from the secretary of the planning board which accompanied the resolution warned that corrections might be made when the minutes came up for approval at the November board meeting. There is nothing in the record to show that there were any corrections, but as of October 31 there might have been.
The resolution reads in part as follows:
"RESOLVED, that the Map hereby is tentatively approved in accordance with the Land Subdivision Ordinance of the Borough subject to the following conditions, and the Chairman of the Board hereby is authorized to affix his signature to said Map with a notation that it has received the preliminary approval of the Board subject to the conditions set forth in these resolutions, a copy of which shall be certified by the Secretary and delivered to the Subdivider."
Immediately following this there are 22 numbered paragraphs grouped under the heading "Conditions of Approval." Most of these conditions clearly relate to work to be done in the future by the developer when he constructs streets, *352 installs under ground utilities and the like. These would be complied with before final approval of the subdivision's features as actually constructed and would be the responsibility of the buyer. A few of the conditions, however  and they are very important for present purposes  relate to matters which either could or should have been taken care of immediately.
Paragraph No. 1 required that before the chairman of the planning board affixed his signature to the map to indicate the board's approval "the Subdivider shall secure endorsement thereon of the Borough Engineer as to his approval thereof."
Paragraph No. 11 provided that "The Subdivider shall revise the maps to show the extension of so-called Robert Court to the westerly property line instead of Scott Court, and to show an easement area for the purpose of extending water mains into the property from the proposed mains to be installed in the Northerly extension of Brookview Drive."
Paragraph No. 14 called for the subsurface drainage system to be modified and altered as recommended by the borough engineer "and shown on the Map in such altered form."
Even though there may have been no subsequent corrections of the minutes at a subsequent meeting, the resolution prepared as a record of the planning board action of October 24, 1960 does not amount to the preliminary or tentative approval contemplated by N.J.S.A. 40:55-1.18. There is no proof that the chairman of the planning board ever signed the map or plat. There is no proof that the borough engineer ever endorsed it and his endorsement was, by the resolution, made an express condition precedent to the signing by the board chairman. Indeed, there were obvious reasons why the borough engineer would not have endorsed the map which was before the planning board at its meeting on October 24. By condition No. 11 there was to be a revision to show an extension of Robert Court and *353 to show an easement area for the purpose of extending water mains. By condition No. 14 there was also to be a change on the map to show modifications and alterations of the subsurface drainage system "as recommended by the Borough Engineer."
In Hilton Acres v. Klein, 35 N.J. 570, 586 et seq. (1961), the Supreme Court recently commented upon the importance of making, at the tentative-approval stage, satisfactory percolation tests in a proposed real estate development. There a condition had been inserted in the resolution, but its performance had apparently been waived or modified by an express or implied understanding of the parties, and there was no contention before the court that the tentative approval which had been granted was void as a result of deficiencies in handling percolation tests at or prior to the tentative approval; so the question of whether that approval was ineffective was not determined. The court said, however (35 N.J., at p. 586):
"It is well known that failure of local planning authorities to insist in the beginning on an adequate disposal method in the light of the soil characteristics and topography of the particular tract, as well as sufficient facilities to care for the allied problem of water drainage, is more responsible for later subdivision difficulty and municipal expense than any other deficiency. See Ardolino v. Florham Park Board of Adjustment, 24 N.J. 94, 108-109 (1957). The planning act therefore wisely specifies that a planning board, in acting on plats, `shall require, among other conditions in the public interest, that the tract shall be adequately drained * * * [and] that all lots shown on the plats shall be adaptable for the intended purposes without danger to health or peril from flood, fire, erosion, or other menace.' N.J.S.A. 40:55-1.20. (Emphasis supplied) As we said in Levin, this inquiry and determination of suitability, with conditions to be met to assure it, is to be made, overall, at inception  on the application for tentative approval  for the proper protection of the public interest as well as to enable the developer to discern with particularity what he must do. 35 N.J., at pp. 510-511. See also Kotlarich v. Ramsey, 51 N.J. Super. 520, 531-532 (App. Div. 1958)."
These comments make it clear that an adequate drainage system in a new development should not be treated *354 as a problem to be solved after the developer's basic plan for the placement of streets and the arrangements of lots has been given an official blessing which is called "tentative" but which nevertheless gives the developer  once his map is in fact approved  vested rights for a three-year period. The requirement in condition No. 14 of the Woodcliff Lake resolution of October 24, 1960 is therefore, we think, subject to the legal requirement that it be treated as a condition to be met for tentative or preliminary approval rather than a condition of some future final approval.
Municipal bodies which pass upon proposed subdivisions of real estate do not meet frequently. It is a convenience to everyone if, after hearing an application, approval can be announced subject to making certain changes in or additions to the proposed map, which are to be checked by the municipal engineer or some other appropriate official. When a resolution, as in the present case, expressly calls for changes to be made in the map or plat submitted to the board and for those changes to be passed upon by the municipal engineer, it is clear, we think, that such conditions are attached to the tentative or preliminary approval and cannot be postponed until the final approval stage.
The defendant was not entitled to call upon the plaintiff to accept a deed and pay the balance of the purchase price until tentative approval of the proposed subdivision had been procured in the form contemplated by the statute; and certain conditions of such approval which were specified in the planning board's resolution of October 24, 1960 not having been met by the date fixed for the closing of title, the Law Division was correct in treating the contract at an end and granting the plaintiff judgment for the return of his partial payment.
Judgment is affirmed.