PENNYTON HOMES, INC., A NEW JERSEY CORPORATION, PLAINTIFF-APPELLANT, v. PLANNING BOARD OF THE BOROUGH OF STANHOPE AND THE MAYOR AND COUNCIL OF THE BOROUGH OF STANHOPE, DEFENDANTS-RESPONDENTS.

Argued January 20, 1964—Decided March 2, 1964.

*Mr. Herbert S. Glickman* argued the cause for plaintiff-appellant (*Messrs. Scerbo, Hegarty, Mintz, Glickman, Kobin & Howe,* attorneys).

*Mr. Lewis Stein* argued the cause for defendants-respondents (*Mr. Milford Salny,* attorney and of counsel; *Mr. Stein,* on the brief).

The opinion of the court was delivered by

HALL, J. This land subdivision approval case involves a question not specifically passed upon in *Levin v. Township of Livingston,* 35 *N. J.* 500 (1961), and *Hilton Acres v. Klein,* 35 *N. J.* 570 (1961), *viz.,* whether improvements which a municipality may require a developer to install at his expense are confined to those specified by ordinance at the time tentative approval of the subdivision is granted.

The rights conferred by tentative approval are set forth in the following portion of *section* 18 of the Municipal Planning Act (1953), *N. J. S. A.* 40:55–1.18:

"The governing body or the planning board, as the case may be, may tentatively approve a plat showing new streets or roads or the resubdivision of land along a mapped street. This tentative approval shall confer upon the applicant the following rights for a 3-year period from the date of the tentative approval:

(1) that *the general terms and conditions upon which the tentative approval was granted will not be changed.*

(2) that the said applicant may submit on or before the expiration date the whole or part or parts of said plat for final approval." (Emphasis supplied)

The provision of the act relating to improvements is found in *section* 21, *N. J. S. A.* 40:55–1.21:

"*Before final approval* of plats *the governing body may require*, in accordance with the standards adopted by ordinance, the installation, or the furnishing of a performance guarantee in lieu thereof, of *any or all of the following improvements* it may deem to be necessary or appropriate: street grading, pavement, gutters, curbs, sidewalks, street lighting, shade trees, surveyor's monuments, water mains, culverts, storm sewers, sanitary sewers or other means of sewage disposal, drainage structures, and such other subdivision improvements as the municipal governing body may find necessary in the public interest." (Emphasis supplied)

The question, therefore, boils down to whether improvements specified as required by an ordinance as it existed at the date of tentative approval constitute a part of "the general terms and conditions upon which the tentative approval was granted."

To make the issue concrete, in this case the plaintiff obtained tentative approval of its entire development in March 1959. The municipality's subdivision ordinance then required paving of all streets to a width of 30 feet within the requisite 50-foot right of way, but did not specify that sidewalks had to be constructed. In March 1960 the ordinance was amended to increase the paving width to 34 feet (although the right of way width requirement was not

changed) and to compel the installation of four-foot sidewalks on both sides of the right of way. Plaintiff was granted final approval of six of the seven sections of the subdivision at intervals between October 1959 and January 1961. Although all but one of these approvals were granted after the ordinance amendment, the municipality did not insist on the sidewalks or the wider street pavement in any of these sections. Final approval of the last section was sought in November 1961. This time the Planning Board rejected the application because plaintiff had not provided for installation of the wider pavement and sidewalks (and for another reason which was ineffective and has no pertinence now). The Borough's change of position was apparently based on what were considered to be the implications of the *Levin* opinion (35 *N. J.* 500), handed down July 14, 1961. On plaintiff's appeal, pursuant to *N. J. S. A.* 40:55–1.19, the governing body affirmed the action of the board.

Plaintiff then instituted this suit to compel a grant of final approval based, *inter alia,* on 30-foot street pavements without sidewalks. It was successful in the trial court, but the Appellate Division, on the municipality's appeal, reversed this aspect of the determination, holding that the municipality could lawfully increase the nature and extent of the required improvements between tentative and final approval. 78 *N. J. Super.* 588 (1963). We granted certification on plaintiff's petition. 40 *N. J.* 503 (1963). The defendants have not sought review of another aspect of the intermediate court's decision which was favorable to plaintiff.

In *Levin,* we held that an ordinance change, during the interval between tentative and final approval, in the specifications for street pavement to require bituminous concrete instead of penetration macadam was not precluded by the guarantee provision of *N. J. S. A.* 40:55–1.18. The rationale was that this type of minor upgrading was certainly not the kind of thing the Legislature had in mind in speaking of

"general terms and conditions," whether or not "improvements" are encompassed within that classification. *Levin* was followed by *Hilton Acres,* 35 *N. J.* 570, in which it was decided that zoning ordinance minimum lot size is a "general term or condition" of tentative approval entitled to immunity from increase during the specified period. 35 *N. J.,* at *pp.* 577–578.

■ The answer to the question of statutory construction and interpretation posed here, as was also the case in *Levin* and *Hilton Acres,* is to be found in the sphere of legislative intent, for the whole field of subdivision regulation is peculiarly a creature of legislation. We analyzed the apparent scheme and purpose at some length in those cases, particularly in *Levin,* and pointed out the policy considerations and competing interests of the public and the developer which the Legislature obviously had to consider and resolve in arriving at its decision on the form of the legislation. That broad discussion, while keyed to the particular issues there to be decided, has general application here as well. It need not be repeated except to point out that the fundamental stress of both opinions was the evident legislative intent of the primacy of the public interest. For example, in *Levin* it was said:

"The statutory provisions * * * authorizing municipal regulation of subdivision[s] * * * are to be construed most favorably to municipalities, in line with the expressed legislative intent to grant 'the fullest and most complete powers possible.' *N. J. S. A.* 40:55–1.3. Questions of interpretation and construction must therefore be resolved in favor of governmental authority, when reasonably possible to do so, for the maximum protection of the primary public interest, as well as incidentally for the benefit of the individuals who become the ultimate owners of the subdivider's final product. This does not mean that the legitimate interests of the developer are to be completely forgotten. He is entitled to substantive and procedural fairness, having in mind the primacy of the public interest and the principal objects of regulation." (35 *N. J.,* at *p.* 507)

■ Utilizing this same approach to the question of whether "improvements" required by ordinance pursuant to

the authority of *N. J. S. A.* 40:55–1.21 are part of "the general terms and conditions upon which the tentative approval was granted," we are convinced the answer is clear enough, as an abstract proposition and with particular respect to the items of sidewalks and width of street pavement here involved, that they are not.

The chronological history of the statute as well as its current format in itself furnishes strong backing for this conclusion. The original planning act of 1930, *R. S.* 40:55–1 through 21, had no provision authorizing a municipality to require a developer to install improvements. It dealt only with requirements in the nature of general conditions to be imposed by a planning board in the approval of plats, *R. S.* 40:55–13 (expanded to some extent by amendment, *L.* 1948, *c.* 464, § 4), similar to, but not as comprehensively expressed as, those presently specified in *N. J. S. A.* 40:55–1.20. There was no provision for the current two-step process of tentative and final plat approval. "Approval" was a single act, final in nature (except perhaps in one limited situation, see *R. S.* 40:55–19), and there was no problem of protection to a developer by reason of any preliminary or tentative approval.

Authority to compel the installation of improvements was introduced into the scheme by the somewhat extensive amendments of the original act made by *L.* 1948, *c.* 464, § 5, in substantially the same form as the present *N. J. S. A.* 40:55–1.21. Significantly, this was not an amendment of the general conditions section of the law, *R. S.* 40:55–13, but of *R. S.* 40:55–14, which originally dealt with planning board approval as a prerequisite to the filing of a subdivision plat.

The two-step procedure permitting tentative and final approval came into being with the 1953 Planning Act, which repealed the entire former law as amended. The provision authorizing tentative approval and specifying the rights conferred thereby, previously quoted, is found in the procedural section, *N. J. S. A.* 40:55–1.18, which was adapted

from *R. S.* 40:55–12 in the prior act. The first mention of "improvements" in the statute does not occur until *N. J. S. A.* 40:55–1.21 and that section commences with the words: "Before *final approval* of plats the governing body may require * * *." (Emphasis supplied)

The statutory development, the arrangement of the sections, and the language used all indicate sufficiently a legislative decision that the improvements to be required of the developer—a different category of items, broadly speaking, than general terms and conditions—were not to be definitively determined as of the date of tentative approval. It might be said that this represents a compromise between protection of the public interest and the interests of the subdivider. Tentative approval must fix the more basic items (see discussion in *Levin,* 35 *N. J.,* at *pp.* 510–511) from which the developer may determine whether his project is fundamentally feasible, such as over-all suitability, general design, street layout and right of way width, number and location of lots, minimum lot size, yard requirements, underlying drainage adequacy, and temporary land reservation for schools, parks and playgrounds. Not frozen will be the particular items specified in *N. J. S. A.* 40:55–1.21, as to which the developer is put on notice that any of those not required by the local ordinance at the time of tentative approval may be thereafter compelled.

This legislative determination gives the municipality the salutary opportunity to compel additional improvements which time demonstrates to be necessary or desirable from the public standpoint. For instance, it was suggested in the instant case that sidewalks were found essential in the last section of the development for safety reasons because a school had been erected adjacent to that section and large numbers of children living in the other sections had to walk in the streets of this final section to reach the school unless sidewalks were provided. Again, at the time of a tentative approval individual septic tank sewage disposal may appear sufficient, but subsequent events may demonstrate that to

be an inadequate method and dictate the requirement of a sewer system as a condition of final approval.

■■ From what we have said concerning the intended legislative scheme, it follows that any agreement between the municipal agency and the subdivider at the time and as part of tentative approval with respect to the improvements which will be required for final approval would not be binding or effective. All of this may well make advance ascertainment of a developer's complete costs uncertain, but the Legislature seems to have decided that he should not be entitled to such complete assurance for by another section of the statute, *N. J. S. A.* 40:55-1.23, he may not validly sell or agree to sell a lot prior to final approval and any advertisement or offer of proposed houses at a specific price before that event is at his peril. See *Levin,* 35 *N. J.,* at *p.* 521. He may, however, protect himself by obtaining final approval promptly after tentative approval and furnishing a performance bond based on 'the ordinance requirements at that time. See *Levin,* 35 *N. J.,* at *pp.* 516–517. (The matter of how long final approval remains effective and a shield against future municipal legislative action was discussed but not decided in *Levin.* 35 *N. J.,* at *pp.* 518–19. This case also does not require determination of the question.)

While we think the legislative intent is apparent as we have outlined it, we do discern that there may be "gray areas" of possible overlap, not involved in this case, of the permissible improvements specified in *section* 21 and the general terms and conditions outlined in *section* 20. As one example, the list of improvements which may be required at any time up to final approval includes storm sewers and drainage structures. *Section* 20 specifies that adequate drainage and adaptability of all lots for the intended purpose without peril from flood or erosion must be provided for as one of the conditions of tentative approval, with consequent protection against change for the three-year period.

Legislative clarification is desirable. Until that takes place, we presume courts should lean in favor of the public interest.

The judgment of the Appellate Division is affirmed.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.