89 N.J. Super. 254 (1965)
214 A.2d 538
U.S. HOME & DEVELOPMENT CORPORATION, A CORPORATION OF THE STATE OF DELAWARE, AUTHORIZED TO DO BUSINESS IN THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOSEPH LaMURA, JR., BUILDING INSPECTOR OF THE TOWNSHIP OF MARLBORO, MAYOR AND COUNCILMEN OF THE TOWNSHIP OF MARLBORO, AND THE TOWNSHIP OF MARLBORO, IN THE COUNTY OF MONMOUTH, A MUNICIPAL CORPORATION IN THE STATE OF NEW JERSEY, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 29, 1965.
Decided November 15, 1965.
*256 Before Judges CONFORD, KILKENNY and LEONARD.
Mr. Joseph T. Grause argued the cause for appellants (Messrs. Parsons, Canzona, Blair & Warren, attorneys).
Mr. Stewart M. Hutt argued the cause for respondent (Messrs. Hutt & Berkow, attorneys; Mr. Sam Weiss, of counsel).
The opinion of the court was delivered by CONFORD, S.J.A.D.
This is an appeal by defendants from a summary judgment entered by the Law Division, Monmouth *257 County, in favor of plaintiff developer, and ordering defendant LaMura, building inspector of Marlboro Township, to issue building permits to plaintiff for 20 lots in section 1-B of plaintiff's approved and filed subdivision development entitled, "U.S. at Marlboro West."
Final approval of sections 1-B and 1-A of the subdivision, encompassing 42 lots, had been granted by the planning board then in office on December 27, 1963, and by the Marlboro Township Committee (as required by the subdivision ordinance) on December 30, 1963. The approved map of section 1-B was filed in the Monmouth County Clerk's Office February 5, 1964. The approvals mentioned arose out of an application submitted April 10, 1962 by plaintiff for tentative approval of a major subdivision, ultimately to embrace hundreds of lots, followed by preliminary approval by the planning board April 30, 1963. For some reason not indicated in the record, that approval was later voided and the application was resubmitted November 12, 1963. On December 11, 1963 preliminary approval was voted by the planning board "subject to the approval of the Monmouth County Planning Board and the approval of the Marlboro Township Municipal Utilities Authority." On December 27, 1963 the planning board granted final approval of sections 1-B and 1-A. On the same day the Municipal Utilities Authority had granted franchise consents to a water company and a sewerage company owned by plaintiff for conducting water and sewerage utilities in the subdivision. On December 30, 1963 the township committee granted final approval for sections 1-B and 1-A.
As of January 1, 1964 the form of government of Marlboro was changed to Mayor-Council Plan E under the Faulkner Act, and the former township committee was superseded as the governing body by the new council on May 29, 1964. It appears that some, if not most, of the members of the new body had campaigned for election thereto in opposition to what was asserted to be excessive and over-rapid residential development of the township, particularly by "mass-developers" like plaintiff. The old planning board was superseded by *258 a new board, appointed by the new governing body, and it assumed its functions on June 1, 1964.
On September 17, 1964 plaintiff applied to defendant building inspector for building permits for eight dwellings in section 1-B. These were promptly refused on the ground that the official had orders from the council not to issue the permits. The action was subsequently explained in a letter which stated that "no Utilities Authority approval" had been given the subdivision. On October 13, 1964 plaintiff applied for permits for 12 additional dwellings in section 1-B. These were likewise refused, first, for the reason that the building inspector had orders from the council not to issue them, and second, on the ground that the building code of the municipality prohibited issuance of more than ten building permits to any developer at one time.
This action in lieu of prerogative writs to compel the issuance of the permits was brought October 19, 1964. The first count of the complaint complains of the refusal of the first eight building permits; the second, of the denial of the 12 others. The answer filed by defendants, so far as it concerns section 1-B and plaintiff's claimed right to build thereon, sets forth the following defenses: (1) the final approval by the former township committee on December 30, 1963 was invalid by reason of the fact that "approval of the plans and specifications for water and sewer facilities was not obtained" from the Municipal Utilities Authority and "approval of the map was not obtained from the Monmouth County Planning Board"; (2) the lot sizes on the subdivision map did not conform to the then existing zoning ordinance of the township; (3) the map did not comply with the zoning ordinance provisions in that "all lots shown thereon did not have a minimum frontage of 100 feet," so that approval of the map by the planning board was illegal; (4) the zoning ordinance when the permits were applied for required 40,000 square feet and a minimum frontage of 200 feet per lot, and none of the lots in question exceeded 20,000 square feet or 100 feet frontage. Another purported defense, concerning decreases in *259 lot sizes and frontages on the map finally approved from those shown on the "tentatively approved" map is here immaterial because the defense was asserted in relation to section 2-A, which is not involved in this action.
Plaintiff moved for summary judgment, supported by affidavits, and defendants resisted, with supporting affidavits. After hearing argument, Judge Mariano filed an opinion February 2, 1965 stating his findings and conclusions in support of his determination to grant summary judgment in favor of plaintiff. Summary judgment followed.

I.
A preliminary question, not dealt with in the trial court's opinion, is raised by plaintiff. This is whether defendant building inspector, as a ministerial officer charged with the duty to issue building permits for construction of dwellings in proper cases, was not required to do so in this instance to the extent that the dwellings were to be erected in accordance with an approved and filed subdivision map, and where the plans and specifications in all other respects complied with the building code and zoning ordinance. If the plans and specifications met building code and zoning ordinance requirements, it is clear that it was improper for the building inspector to deny permits solely on orders of the governing body, as that entity had no jurisdiction over him in the matter. Federal Advertising Corp. v. Hardin, 137 N.J.L. 468 (Sup. Ct. 1948). Nor was assumption of jurisdiction over the building inspector by the council justified by the investigation of the validity of the previous approvals by the former planning board and township committee. Those actions were presumptively correct, the maps had been duly filed, and the building inspector was controlled thereby unless and until the previous approvals were rescinded under due process and notice to the parties thereby affected by any agency that might have the appropriate jurisdiction to do so. No such action has ever been taken in this case. The municipal *260 agencies vested with subdivision control, assuming a power to rescind prior invalid subdivision approval by such agencies, clearly cannot do so on their own motion, without a hearing and opportunity to be heard by those affected thereby. Cf. Highpoint, Inc. v. Bloomfield Planning Board, 87 N.J. Super. 58, 64 (App. Div. 1964).
However, defendants do raise questions other than the alleged invalidity of the prior subdivision approvals, which we must deal with. Moreover, since the trial court did determine the validity of those approvals, and the local public interest is served by an adjudication thereof, we will pass upon the merits of those questions.

II.
Insofar as the prior subdivision approvals are contended to have been invalid because of absence of approval of plans and specifications for sewer and water facilities by the Municipal Utilities Authority, and because of lack of county planning board approval, we are in essential agreement with the conclusions of Judge Mariano and the supporting facts and reasons set forth in his opinion. We will not here repeat them. We do not, however, fully subscribe to the view stated in the opinion that "The subdivision ordinance takes the problem of water supply and sewerage out of the jurisdiction of the Planning Board and rests it in the jurisdiction of the Utilities Authority." As indicated in the opinion, the ordinance empowered the planning board, if it chose, to make preliminary approval subject to the condition subsequent of ultimate Utilities Authority approval of specific sewerage or water plans. Such approval was not authorized to be made a condition precedent of preliminary planning board approval. Nor did the planning board, from the language of the ordinance, have to lay down such a condition at all. It apparently had the option of leaving the matter of satisfactory sewerage and water plans to the Utilities Authority in entirety since article VII of the ordinance, "Improvements," unequivocally *261 states that "Plans, specifications and construction of water supply and/or sanitary sewers shall be under the jurisdiction of the * * * Municipal Utilities Authority." That option appears to have been here exercised, and the latter agency is exercising its responsibilities.
The following additional facts, some elicited by this court at oral argument, may be noted. On March 5, 1965 the Marlboro Township Municipal Utilities Authority authorized the execution of an amendment of the prior contract for water supply between the Authority, the developer and the developer's sewerage and water company. The amended form of contract refers to the fact that the "distribution system * * * has already been approved by Charles Kupper C.E." (the Authority's consulting engineer). The New Jersey State Board of Health on September 18, 1964 and September 21, 1964 granted to plaintiff's sewerage company permits for the construction and operation of a proposed sewage treatment plant and a sanitary sewer system. On January 6, 1965 the State Water Policy and Supply Council gave plaintiff's water company approval for a well to draw 250,000 gallons of water daily.

III.
Defendants contend that since the minimum lot size and frontage areas were increased to 40,000 square feet and 200 feet, respectively, in June 1964, by zoning ordinance amendment, plaintiff's application in September 1964 for permits for dwellings on lots of 20,000 square feet with 100 foot frontages was out of order. They construe Hilton Acres v. Klein, 35 N.J. 570 (1961), to protect a developer in respect of lot sizes and dimensions only up to the date of final approval of the subdivision, no matter how soon after tentative approval that occurs. They contend that thereafter the developer is at peril of any ordinance changes increasing lot sizes and dimensions. Plaintiff, on the other hand, argues that the statutory three-year protection as to the "general terms and *262 conditions upon which the tentative approval was granted," N.J.S.A. 40:55-1.18, which, in Hilton Acres v. Klein, supra, was held to encompass lot sizes and dimensions, is for a full three-year period from the date of tentative approval, regardless of how soon after tentative approval it obtains final approval. While there is language in Hilton Acres suggestive of support for plaintiff's position (35 N.J., at p. 580), it is clear that the precise issue before us here was not a concern of the court in that case. See also the discussion in Levin v. Livingston Tp., 35 N.J. 500, 518-519 (1961), as to "the period of effectiveness of final approval" which, too, is not determinative of the problem here at hand, although there, again, is to be found language helpful to plaintiff's position. Id., at p. 519.
We have concluded that we are not required here to decide whether plaintiff's position is necessarily correct. It suffices that we determine that defendants' is wrong. It would be a plainly unreasonable construction of the statute to hold, as defendants urge, that the moment the developer obtains final approval the municipality may change the general terms and conditions upon which the tentative approval was granted. The broad intimation in Levin is that the Legislature may well have intended that "the effectiveness of final approval" should extend at least to "a reasonable date after the grant." (35 N.J., at p. 519) We here hold that, at the minimum, the developer is entitled to a reasonable time after grant of final approval to execute his development plan before the municipality may disrupt it by an increase of minimum lot sizes and dimensions retroactively applicable thereto.
Here the period between December 30, 1963, when final approval was granted, and September and October 1964, when the permits were applied for, was not so unreasonable a time as to permit destruction of plaintiff's rights by upgrading of lot sizes in the interim. The zoning ordinance amendment therefore constituted no lawful justification for denial of the building permits.

*263 IV.
Referring to defendants' contention that the subdivision approvals were invalid because "all lots shown" on the maps "did not have a minimum frontage of 100 feet," we note, first, that defendants' brief fails to manifest by specific reference to the record any indication that any lots in section 1-B, which is all that concerns us in this action,[1] were less than 100 feet in frontage. Beyond that circumstance, as indicated by Judge Mariano's opinion, the ordinance qualifies the 100-foot requirement in respect of odd-shaped or triangular lots. It appears that there are some such in the subdivision involved, and defendants do not even allege, much less support by factual proof, an assertion that any particular lot on the map which may be less than 100 feet in width is not of a shape that meets the ordinance requirements. Judge Mariano's disposition of this contention of defendants accords with our views. The proofs presented no genuine issue of fact in this regard which precluded summary judgment.

V.
Plaintiff challenges by this action the validity of the provisions of the Marlboro ordinance which restrict developers to ten building permits at a time, and which were relied on by the building inspector in denying the second set of applications for permits. The trial court did not pass upon this question, but the pleadings joined issue on it and it is necessary that we decide the matter in order to determine the correctness of the summary judgment in relation to the second count of the complaint.
The provision in question, article II, section 1(j) of the ordinance, reads:
*264 "The Building Inspector shall issue only ten (10) building permits to each developer at one time; when the foundations of the building to be erected have been inspected and approved, the Building Inspector shall then issue an additional ten (10) permits. When the framing has been completed on the first ten (10) buildings and the foundations completed on the second ten (10) buildings and both inspected and approved by the Building Inspector, then the Building Inspector shall issue an additional ten (10) permits. When the buildings covered by the first ten (10) permits have been enclosed, the buildings covered by the second ten (10) permits have been framed, and foundations have been completed on buildings covered by the third ten (10) permits and inspected and approved by the Building Inspector, the Building Inspector shall then issue an additional ten (10) permits, making forty permits in all issued to one developer for forty buildings in process of construction. Upon completion of the buildings first constructed, the enclosure of the buildings next constructed, the framing of the buildings next constructed and the completion of the foundations of the buildings last constructed and inspection and approval of same by the Building Inspector, he shall then be permitted to issue an additional ten (10) permits."
Defendants' brief is devoid of citation of any statutory basis or of any argument as to any other supporting justification for so drastic an impingement on the right of a developer to build homes in accordance with his economic capacity and business exigencies, so long as his plans and specifications for construction otherwise meet the requirements of local ordinance or building code. The whole concept of large-scale subdivision contemplates the incidence of mass development of residential areas where builders may well be commencing construction of more than ten units at a time and where it may be necessary to do so as a matter of economic efficiency. An affidavit on behalf of plaintiff shows that the regulation in question would limit its construction in Marlboro to about 80 homes per year, whereas its intent is to build on 1200 lots, which would take 12 to 15 years under this regulation. It also shows other types of disruption of normal construction practice resulting from such a regulation. Nothing in our Municipal Planning Act (1953), N.J.S.A. 40:55-1.1 et seq., is cited or apparent to us indicative of an intent to allow a municipality to legislate by ordinance a construction slowdown such as would be imposed on plaintiff's operations here. *265 Indeed, the implication would be to the contrary, i.e., that upon grant of final approval of any subdivision or section, no matter how many lots are involved, the developer prima facie is entitled to building permits on all of them. Nor is any such support to be found in R.S. 40:48-1(13) and N.J.S.A. 40:49-5.1, giving municipalities power to adopt ordinances regulating construction generally.
If it were suggested that the purpose of such a regulation is to give the building inspector adequate time to do his work of inspecting the progress of erection of multiple housing and that an intent to permit such a device may be inferred from the statute, we would still be in disagreement. The inspector needs no such regulatory armament as this to enforce building code regulations, if any, requiring his approval at stated stages of the erection of any structure before the builder may proceed with the next stage.
We think the requirements of the ordinance here in question are not only beyond the granted power of the municipality to enact, see Gilbert v. Town of Irvington, 20 N.J. 432, 436 (1956), but are, in addition, arbitrary and unreasonable to the point of invalidity and therefore void for that reason as well. Lakewood Express Service v. Board of Public Utility Com'rs, 1 N.J. 45, 50 (1948).
Defendants urge that, at the least, it was improper to grant summary judgment on this issue since reasonableness always involves a disputed issue of fact. Again, we differ. There is no issue of fact in relation to absence of power to adopt such a regulation. As to the question of reasonableness, we gave defendants an opportunity at oral argument to submit a memorandum as to what proofs they would offer at a hearing on remand, if directed by the court, as to the reasonableness of the regulation. The response was that they could submit no witness who would testify in support thereof and therefore they were confining their defense to the presumption of validity of the ordinance on appeal. In these circumstances, and giving consideration to plaintiff's affidavit mentioned above, we discern no genuine issue of fact in relation *266 to the unreasonableness of the ordinance proviso which requires plenary trial thereof.
We have not found it necessary to decide, as did the trial court, that such defects, if any, attending the grant of preliminary or final approvals of section 1-B, were at most irregularities not serious enough to stamp the official actions as utterly void, and that in view thereof defendants are estopped to attack such approvals in light of reliance thereon by plaintiff, citing Gruber v. Mayor, etc., of Raritan Tp., 39 N.J. 1, 18 (1962).
Judgment affirmed.
NOTES
[1] There was also a motion for summary judgment in a concomitant action, involving section 2-A. Defendants' affidavits deal extensively with alleged deficiencies in respect of that section, in addition to aspects of sections 1-A and 1-B.