MARTIN LEVIN AND ALAN SAGNER, T/A LEVIN-SAGNER HOMES, A PARTNERSHIP, PLAINTIFFS-APPELLANTS, v. THE TOWNSHIP OF LIVINGSTON, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.

Argued February 20, 1961—Decided July 14, 1961.

*Mr. Joseph A. Weisman* argued the cause for plaintiffs-appellants (*Mr. Louis B. Lombardino,* attorney; *Messrs. Hannoch, Weisman, Myers, Stern and Besser* and *Mr. Weisman,* of counsel; *Mr. Geoffrey Gaulkin* and *Mr. George B. Henkel,* on the brief).

*Mr. Louis Bort* argued the cause for defendant-respondent.

The opinion of the court was delivered by

HALL, J. This case involves a narrow, but deeply rooted, aspect of land subdivision regulation by a municipality. Specifically the question is: When, in the course of the planning and construction of a development, do the municipality's specifications for street pavement which it requires the developer to install as an improvement become fixed so that it may not thereafter upgrade them?

Plaintiffs were engaged as land owners in residential sub-division development in the Township of Livingston. Their operations contemplated the laying out of lots and streets and the installation of utilities and other improvements on previously unimproved land, the construction of homes on the lots, and the ultimate sale thereof to individual purchasers. We are concerned with three sections of their developments which were in various stages of municipal approval and physical construction when the township, on March 21, 1960, amended its street ordinance to require thereafter pavement of bituminous concrete instead of the previously specified penetration macadam. The change expressly did not apply to streets in the course of construction if the curbs had been installed and the base course laid at the time of adoption of the amendment.

Plaintiffs then brought this action against the township seeking an adjudication that the amendment could not validly apply to the sections in question. An immutable right was claimed to install streets paved with penetration macadam by reason of prior municipal approval action under the Municipal Planning Act of 1953 (*N. J. S. A.* 40:55–1.1 *et seq., L.* 1953, *c.* 433) and the local subdivision regulation ordinance adopted pursuant thereto on June 21, 1954. The factual situation concerning the status of approval is different as to each section and each was the subject of a separate count in the complaint. The first count related to those sections of the Cherry Hill development as to which only tentative approval had been granted, the second to Section 2 of the same development which had received final approval, and the third to Collins Estates, Section 1B, where the situation is unclear.

The Law Division held, 62 *N. J. Super.* 395 (1960), that the amendment to the street ordinance was properly applicable to each of the three sections and denied plaintiffs any relief. Their appeal was certified on our own motion while pending in the Appellate Division.

The precise problem must necessarily be considered in the light of the whole scheme of subdivision regulation prescribed in the state enabling act and its implementation in Livingston by local ordinance, at least to the extent that such a panoramic view has pertinence to the current issue.

Subdivision control, like zoning, is a tool of overall community planning. They are "closely related * * * in that both are preventive measures intended to avert community blight and deterioration by requiring that new development proceed in defined ways and according to prescribed standards. Zoning relates to the type of building development which can take place on the land; subdivision control relates to the way in which the land is divided and made ready for building development." *Cunningham*, "Control of Land Use in New Jersey Under The 1953 Planning Statutes," 15 *Rutgers L. Rev.* 1, 45–46, *n.* 175 (1960).

Some of the major evils regulation is designed to prevent are succinctly stated by Professor Haar in his recent book, *Land-Use Planning* (1959):

"Subdivisions are entered into for profit. They occur where the growth of population, or some other indicium of land demand, indicates a sufficiently profitable market. Sometimes they are carried out by the original owners of the land, more frequently by professionals engaged in the business of real estate development. More is involved than a bargain between vendor and purchaser. For subdividers are dealing in the permanent assets of the community. The subdivider does not merely sell land; in all but the smallest developments, he has to lay out roads and provide access to the lots. And in so doing he is determining the main outlines and character of the community. Thus the street system and the arrangement of lots of the growing cities are in effect planned, designed, and constructed piecemeal by a number of private real estate developers. Often these independent operations are poorly designed, uncoordinated both with each other and with the layout of the central city, and totally inadequate to cope with the consequent load of automobile and truck traffic.

Farsighted developers were and are aware of these dangers. But many subdivisions are constructed without regard to the convenience or well-being of the resulting community, and in course of time

sink inevitably into the status of a slum; the bad location of new subdivisions 'where street systems and housing were not conformed to topography' is listed as the 'first slum-inducing factor.'" (at *pp.* 347–349)

As this court said in *Lake Intervale Homes, Inc. v. Parsippany-Troy Hills,* 28 *N. J.* 423, 435 (1958): "The * * * [state planning] act was designed to afford municipalities desiring the advantages of its provisions to enact comprehensive regulatory standards which would facilitate sound and orderly future municipal growth along preconceived lines, in short a planned community growth." See also *Mansfield & Swett, Inc. v. Town of West Orange,* 120 *N. J. L.* 145, 150–151 (*Sup. Ct.* 1938); *cf. Kozesnik v. Montgomery Township,* 24 *N. J.* 154, 165 (1957).

The statutory provisions (*N. J. S. A.* 40:55–1.14 to 1.29) authorizing municipal regulation of subdivision (*i. e.,* "the division of a lot, tract, or parcel of land into two or more lots, sites or other divisions of land for the purpose, whether immediate or future, of sale or building development," *N. J. S. A.* 40:55–1.2) are to be construed most favorably to municipalities, in line with the expressed legislative intent to grant "the fullest and most complete powers possible." *N. J. S. A.* 40:55–1.3. Questions of interpretation and construction must therefore be resolved in favor of governmental authority, when reasonably possible to do so, for the maximum protection of the primary public interest, as well as incidentally for the benefit of the individuals who become the ultimate owners of the subdivider's final product. This does not mean that the legitimate interests of the developer are to be completely forgotten. He is entitled to substantive and procedural fairness, having in mind the primacy of the public interest and the principal objects of regulation. And, since the statute spells out in considerable detail the scope, manner and procedure of permissible local regulation, the implementary provisions of the ordinance must be confined within the framework and

reasonable intendment thereof. The municipality may not, on the one hand, go beyond the fair limitations of the act nor may it, on the other, validly impose lesser or contrary requirements than are minimally called for.

Subdivision regulation is hinged upon the requirement of approval, either by the local planning board alone or by the governing body on favorable referral from the board, of all plats (the map of a subdivision) before they may be filed with the county recording officer. *N. J. S. A.* 40:55–1.14. *Kotlarich v. Ramsey*, 51 *N. J. Super.* 520, 526–527 (*App. Div.* 1958). The Livingston ordinance adopts the option of reposing final authority in the township committee with the board serving as a reporting and referring agency—the so-called "weak" planning board set-up. Regulation is provided with several kinds of teeth to make it effective. The statute specifies that no plat shall be accepted for filing in the county record office until (final) approval has been given, *N. J. S. A.* 40:55–1.17, requires the filing of an approved plat within 90 days on pain of loss of (final) approval, *N. J. S. A.* 40:55–1.18, and provides that any person who transfers, sells or agrees to sell any land which forms part of a subdivision before (final) approval thereof shall be subject to fine or imprisonment, *N. J. S. A.* 40:55–1.23. In addition, the last cited section gives the municipality the right to obtain injunctive relief and to set aside such a conveyance in certain circumstances. The upshot is that developers must obtain final approval as a condition precedent to the valid sale, or agreement to sell, by any method, of any lands within any subdivision, unless the subdivision is exempt therefrom under the terms of the enabling act and the ordinance. *Lake Intervale Homes, Inc. v. Parsippany-Troy Hills, supra* (28 *N. J.*, at *pp.* 433–434).

The requirements for plat approval provide the means and character of regulation. Under the statute, these fall into two distinct categories, with different attributes. The first, which is mandatory, is broad and relates to layout, design

and other basic general terms and conditions. The second, with which we are particularly concerned, is permissive, involving specific tangible "improvements," above and beyond the general terms and conditions, which the municipality may by ordinance compel the developer to install at his expense.

With reference to the first classification, this court said in *Ardolino v. Florham Park Board of Adjustment*, 24 *N. J.* 94, 110 (1957): "It is the obvious intent of the act that in matters requiring the approval of the planning board it should have authority to impose those conditions which in the circumstances it believes are reasonably necessary for the protection of the public good and welfare." The section (*N. J. S. A.* 40:55–1.20), captioned "Conditions to be required in acting upon plats," reads:

"In acting upon plats the planning board shall require, among other conditions in the public interest, that the tract shall be adequately drained, and the streets shall be of sufficient width and suitable grade and suitably located to accommodate the prospective traffic, to provide access for fire-fighting equipment to buildings and to be co-ordinated so as to compose a convenient system, conforming to the official map, or if there is no official map, relating properly to the existing street system. [Where the planning board after hearing has adopted portions of the master plan with proposals regarding the street system within the proposed subdivision, the board may require that the street shown conform in design and in width to the proposals shown on the master plan. No street of a width greater than fifty feet within the right-of-way lines may be required unless said street already has been shown on such master plan at the greater width, or already has been shown in greater width on the official map.]

The planning agency shall further require that all lots shown on the plats shall be adaptable for the intended purposes without danger to health or peril from flood, fire, erosion, or other menace. [If portions of the master plan contain proposals for drainage rights-of-way, schools, parks, or playgrounds within the proposed subdivision or in its vicinity, or if standards for the allocation of portions of subdivisions for drainage rights-of-way, school sites, park and playground purposes have been adopted, before approving subdivisions the planning board may further require that such drainage rights-of-way, school sites, parks or playgrounds be shown in locations and of sizes suitable to their intended uses.] The governing body or

the planning board shall be permitted to reserve the location and extent of school sites, public parks and playgrounds shown on the master plan or any part thereof for a period of one year after the approval of the final plat or within such further time as agreed to by the applying party. Unless during such one-year period or extension thereof the municipality shall have entered into a contract to purchase or instituted condemnation proceedings according to law, for said school site, park or playground, the subdivider shall not be bound by the proposals for such areas shown on the master plan. This provision shall not apply to the streets and roads or drainage rights-of-way required for final approval of any plat and deemed essential to the public welfare."

The intent to give wide and strong municipal authority is clear. The only precise limitations are found in *N. J. S. A.* 40:55–1.15, requiring that the ordinance contain standards for approving the design of subdivisions and of the streets therein and that, where there is a local zoning ordinance, the standards in the subdivision ordinance with respect to minimum lot sizes and lot area requirements be identical with those in the zoning ordinance.

 The purposes behind and the scope of the required general terms and conditions are equally plain. At inception the planning board must pass upon basic matters of the highest significance to future community growth and well-being and the welfare of individuals who will ultimately become owners and occupants in the subdivision. See *Mansfield & Swett, Inc. v. Town of West Orange, supra* (120 *N. J. L.*, at *p.* 145). For instance, it is of essential importance to determine whether the whole tract proposed to be subdivided is fundamentally suitable for the projected development from the standpoint of area, topography, drainage, soil characteristics, accessibility, availability of utilities and the like, or, if not, in whole or in part, whether and to what extent special conditions can be imposed to make it so. *Cf. Kotlarich v. Ramsey, supra* (51 *N. J. Super.,* at *pp.* 531–532). It must also decide upon the best layout of lots and streets and whether it conforms to the ordinance design and to the master plan and official map (if the municipality has adopted such). It must consider the impact

upon adjacent areas and the effect of other pertinent ordinances of the municipality. ⌜Special drainage and sanitary sewage disposal problems may require particular remedies to ° be undertaken.⌟ In certain situations it may temporarily reserve portions of the tract for schools, parks and playgrounds. In short, at inception the board has the very great responsibility of doing everything possible to avoid future problems of vital importance to the community and subsequent individual property owners.

■ The Livingston ordinance implements these purposes by specifying standards in detail and prescribing the information which must be furnished on or with the preliminary plat with respect to the layout and characteristics of the entire development. With particular reference to streets, the design standards require that "[t]he arrangement, character, extent, width, grade and location of all streets shall conform to the Master Plan and Official Map, and shall be considered in relation to existing and planned streets, to topographical conditions, to public convenience and safety, and in relation to the proposed uses of the land to be served by such streets" and goes on to specify in greater detail provisions for the arrangement and related aspects of proposed streets not already shown on the master plan or official map. The "character" of the street, as used in the quoted portion of the ordinance, obviously refers to function and type, such as arterial, collector and so forth, and not, as plaintiffs suggest, to specifications of construction. The greater detail provisions mentioned similarly do not encompass matters of construction. These ordinance provisions are clearly within the scope and intent of the enabling act provisions relating to general "conditions to be required" and street design standards which must be included in the local legislation.

Early determination of the basic matters of which we have been speaking is likewise of great importance to the developer. He needs to know in the beginning whether his tract and development scheme can ultimately gain the final approval of the municipality and what will be required of

him with respect to the most financially significant items of layout and the like, so that he may decide whether it is economically feasible to go ahead. And, in fairness, he should be enabled to make this decision before he has made or committed himself to large expenditures. So the general revision of the planning act in 1953 introduced for the first time a two-step approval procedure, permitting municipalities to provide for "tentative approval" of plats, *N. J. S. A.* 40:55–1.18, by which these basic matters may be settled. From what has been said, it is obvious that tentative approval is the most important phase of the subdivision regulation process. Most municipalities, including Livingston, have accepted the option thus given them and make this procedure compulsory. In order to give meaning to such preliminary approval and furnish the developer assurance upon which he may rely, the statutory section goes on to provide that tentative approval shall confer upon the applicant the following rights for a three-year period thereafter:

"(1) that the *general terms and conditions* upon which the tentative approval was granted will not be changed.

(2) that the said applicant may submit on or before the expiration date the whole or part or parts of said plat for *final approval.*" (Emphasis added)

See *Hilton Acres v. Klein,* 64 *N. J. Super.* 281, 290–295 (*App. Div.* 1960), certification granted 34 *N. J.* 329 (1961). Final approval under the two-step procedure amounts to endorsement of the final form of the plat to be filed in the county recording office after board investigation and determination that the terms and conditions of tentative approval have been met and that required improvements, shortly to be mentioned more fully, have been installed or provided for, *N. J. S. A.* 40:55–1.21. Final approval, while perfunctory to a certain extent, is not only the key to the right and requirement to file the map, *N. J. S. A.* 40:55–1.17, but is also, as we view the legislative scheme, the prerequisite to the obtaining of any building permit, *N. J. S. A.*

40:55–1.39,[1] and to the transfer, sale or agreement to sell any of the land in the subdivision, *N. J. S. A.* 40:55–1.23. It contemplates that a subdivider has decided to go ahead and that he is ready to proceed promptly with complete development and building construction at least in the section for which he seeks such approval.

This brings us to a consideration of the second category of requirements for plat approval—the matter of "improvements." Here it is evident the Legislature was thinking and talking about something above, beyond and distinct from requirements imposed as general terms and conditions of which we have been speaking. A distinct section of the 1953 planning act, *N. J. S. A.* 40:55–1.21, provides:

"Before the final approval of plats the governing body may require, in accordance with the standards adopted by ordinance, the installation, or the furnishing of a performance guarantee in lieu thereof, of any or all of the following improvements it may deem to be necessary or appropriate: street grading, pavement, gutters, curbs, sidewalks, street lighting, shade trees, surveyor's monuments, water mains, culverts, storm sewers, sanitary sewers or other means of sewage disposal, drainage structures, and such other subdivision improvements as the municipal governing body may find necessary in the public interest."

---

[1] This section of the Official Map and Building Permit Act (1953), enacted at the same time as the Planning Act and to be read with it, provides, with respect to proposed buildings on streets in a subdivision not previously placed on the official map, that no building permit shall be issued unless the lot abuts a street giving access to the structure which is shown on a plat approved pursuant to the 1953 Planning Act and such street has been certified to be suitably improved or such improvement assured by a performance guarantee. The requirement of plat approval must be construed to mean final approval. *Hilton Acres v. Klein, supra* (64 *N. J. Super.*, at *p.* 297) ; *Cella v. Cedar Grove Board of Adjustment*, 45 *N. J. Super.* 585 (*Law Div.* 1957). A Livingston ordinance adopted in 1956 requires further (apparently applicable where the street improvement has not been completed but a performance guarantee posted) that no permit shall issue, with certain exceptions, until the improvement has reached the point where all utilities and curbing have been installed and the base course of the roadbed laid.

Our original planning act of 1930 (*R. S.* 40:55–1 to 21, inc.) made no express mention of such improvements as it did of required general conditions (*R. S.* 40:55–13). Municipal power to compel such installations at the developer's expense was first authorized by amendment of *R. S.* 40:55–14 in 1948. *L.* 1948, *c.* 464, *p.* 1906, *sec.* 5. As some evidence of the intended legislative distinction between general conditions and improvements, and the respective standards, see *Annotated Suggested Revision of Municipal Planning Enabling Act, p.* 16, prepared in 1952 by the Planning Legislation Subcommittee of the Legislative Advisory Committee on the Revision of the Planning Act.

The purpose of authorizing municipal requirement of such improvements is well expressed by Professor Cunningham ("Control of Land Use in New Jersey," *supra,* 15 *Rutgers L. Rev.,* at *p.* 42) in his comment on *N. J. S. A.* 40:55–1.21:

"All the enumerated improvements seem to be reasonably related to the public health, safety, and general welfare and thus within the state's police power. The installation of such improvements has a direct bearing on the cost to the municipality of street maintenance and provision of services in future years; and it may also work indirectly to prevent irresponsible land subdivision since it tends to make developers and investors consider all aspects of a proposed subdivision before embarking on the undertaking. (Thus it should tend to prevent, for the future, the 'baneful consequences' of premature land subdivision such as occurred in the 1920s. * * *) It seems clear that the cost of such improvements is a legitimate expense of subdividing which ought to be borne in the first instance by the developer and ultimately, in most cases, by the purchasers of lots in the subdivision who benefit directly from the improvements."

The legislative design is plain. It has said that, in addition to requiring basic and necessary general terms and conditions, to be determined on the application for tentative approval, the municipality may also automatically and in all cases require the developer to install or provide for certain specific improvements, which will become public property and the subject of municipal maintenance in the future and which otherwise the municipality would have

to construct at public expense, provided they are set forth in the ordinance in advance. This assures the protection of the public interest in this respect and at the same time sufficiently advises the developer of the kind of thing he must install so that he may make his broad financial and other plans and estimates accordingly.

The Livingston ordinance requires that in every development, the developer shall install streets (paving), curbs, gutters, sidewalks, drainage structures (ordinary storm sewers, ditches and the like), street name signs, shade trees, monuments, water supply,[2] fire hydrants and sanitary sewers. Specifications therefor are set forth generally by reference to other applicable township ordinances and regulations. With respect to streets, which concern us, the ordinance says that they "shall be constructed and installed in accordance with the applicable standard specifications of the Township and subject to the inspection and approval of the Township Engineer. Streets 60 feet or more in width shall have a paved roadway of at least 40 feet in width." Such "applicable standard specifications" are found in the township street ordinance, enacted in 1939, which called for penetration macadam pavement until amended in 1960, as earlier indicated, to require bituminous concrete instead.

The ordinance further provides, pursuant to the statute, that no final plat shall be approved unless and until the Township Engineer has certified that all improvements required by the ordinance have been completed or, in lieu thereof, that a performance guarantee, in an amount equal to the cost of construction based on an estimate of the Township Engineer, in the form of a surety bond or certified check escrow, has been furnished. *N. J. S. A.* 40:55–1.21

---

2 Developer installation of water mains and assessment of the cost thereof may well have special ramifications in certain situations, a matter which does not concern us here. See *Lake Intervale Homes, Inc. v. Parsippany-Troy Hills, supra* (28 *N. J.*, at *p.* 423) ; *Cunningham, supra* (15 *Rutgers L. Rev.*, at *p.* 42–45) and other cases cited therein.

and the ordinance make it plain that installation of such improvements or the guarantee thereof is a prerequisite to a valid final approval.

From what we have said so far, it is apparent that we agree with the trial court that specifications for street pavement are not "general terms or conditions" and so are not guaranteed to the developer against change under the provisions of *N. J. S. A.* 40:55–1.18, at least until final approval. We think this is clear as a matter of statutory construction most favorable to the municipality. As has been pointed out, construction details are not intrinsically the kind of thing intended to be encompassed by the quoted phrase and the Legislature has prescribed distinct treatment for improvements, under different statutory sections, geared to final, and not temporary, approval. A municipality should not, in the public interest, be precluded from making desirable changes in construction specifications for improvements prior to final approval (and in fact should not have the power to contract away in advance the right to do so), unless the enabling legislation compels such a result. Here we think quite the opposite is true. Moreover, compared to the basic conditions of development layout, an upgrading of the type of street pavement is a relatively minor item to the developer which it is not unfair to change when balanced against the future public benefit to be derived from the enhanced requirements.

We do feel, however, contrary to the view of the trial judge, that there comes a point in the approval process where the developer is to be protected against further changes of this nature. We discern a legislative intent that the point is reached when a proper and valid final approval is granted in accordance with the statute and ordinance.[3] This is not a matter of accrual of "vested rights" or some similarly labelled concept, but rather one of statutory construction.

---

[3] The matter of how long final approval remains effective and a shield against future municipal legislative action will be commented on later. What is here said is subject to such comment.

At the time of final approval either the improvements have been installed pursuant to the then requirements—and no one can validly contend that a municipal change after completion could force the developer to tear up the work and do it over according to later upgraded specifications—or the developer has posted security to guarantee that the improvements will be constructed. The amount of the guarantee is based upon the municipality's estimate of the cost of construction pursuant to the municipal standards at that time and the security given represents, either by the conditions of the surety bond or the terms of an escrow agreement, a contract that specified improvements will be completed according to the then specifications. In fact, in the case of streets, frequently, as here, the performance bond will specify the precise kind of pavement to be installed. The statute permits the security as a substitute for performance and we believe it is intended that the decisive point has then been reached.

We come to the application of the principles discussed to the facts of this case. There is no difficulty with respect to the Cherry Hill development. The subject matter of the first count of the complaint relates to those sections of the development which had not progressed beyond tentative approval granted to the whole, comprising some 213 lots, in January 1957. Tentative approval did not preclude thereafter amended street pavement specifications from being applicable. The opposite is true concerning Section 2 of this development, the subject of the second count of the complaint. There valid final approval was granted for approximately 31 lots in January 1960 following the posting of a $48,000 performance bond guaranteeing the installation by December 1, 1961 of the improvements not yet completed. The bond specified the installation of 8-inch penetration macadam street paving. At the time of trial in the spring of 1960 plaintiff was engaged in constructing the streets and a good part of the preliminary work was finished. There can be no doubt that under any view the time interval was

so short that final approval has remained effective to protect against upgrading of pavement requirements after such approval. Here we are satisfied, contrary to the position taken by the trial court, that the ordinance amendment cannot be made to apply and plaintiffs are entitled to complete these streets with penetration macadam.

The approval status of Collins Estates, Section 1B, involved in the third count of the complaint, is confusing. The record is very sparse, consisting primarily of the oral testimony of one of the plaintiffs rather than the official records of the municipality. Our request at oral argument to be furnished with more definite information has not been productive of material sufficiently clear to enable us to resolve the matter. The limited data before us appears to indicate that final approval was granted on May 9, 1956, almost four years before the adoption of the street ordinance amendment, and that little had been done in the section beyond possibly some land clearing and the completion of a very short stretch of macadam pavement near a school. There is no indication whether or when tentative approval had been previously given. Since tentative approval is not only most important but absolutely mandatory under the township ordinance, final approval without it would be invalid and ineffective for any purpose. Moreover, even if tentative approval had been given, it would appear that the improvements had not been completed or a performance guarantee furnished before the grant of final approval. If this be the fact, again there could be no valid final approval for any purpose and there would be no protection at all against subsequent changes in improvement requirements or specifications or, for that matter, against changes in general terms and conditions after three years from the date of tentative approval.

The full facts as to this section may also raise the question of the period of effectiveness of final approval. From the whole statutory scheme it is quite obvious that final approval was never intended to permit freezing in-

definitely general terms and conditions or improvement requirements and standards for the development of a particular tract of land. The statute gives the subdivider three years from the date of tentative approval to make up his mind and complete his plans. Final approval, since it may be obtained by sections of the whole, is based on the idea of intention and readiness to proceed to completion at once. In 1948 the Legislature provided that a performance bond for improvements shall run for a period not to exceed three years, with the right in the planning board to extend for an additional time not exceeding three years. *L.* 1948, *c.* 464, *p.* 1906, *sec.* 5. This was repealed by the revision of the planning act in 1953 (*N. J. S. A.* 40:55–1.28) and the statute is presently silent.[4] It could be argued therefrom that the Legislature thereby intends that time for completion of improvements and the effectiveness of final approval shall not extend beyond a reasonable date after the grant. It seems clear that broad considerations in the public interest indicate that final approval should not forever bar desirable changes in terms and conditions or improvement requirements, *cf. Lake Intervale Homes, Inc. v. Parsippany-Troy Hills, supra* (28 *N. J.,* at *p.* 423), but it would be inappropriate for us to speak further at this time since the question has not been argued. The resolution of the situation involved in the third count will have to be remanded to the trial court

---

[4] The County and Municipal Law Revision Commission, now engaged in preparing a revised zoning and planning law, in a suggested second draft thereof (June 1961) proposes (at *p.* 18) that final approval shall have the effect of protecting against a subsequent change in applicable zoning restrictions for a period of two years, with the right in the local governing body to extend for a further period of one year.

The Livingston subdivision ordinance presently contains a provision similar to that in the 1948 law to the effect that improvements shall be fully completed no later than three years after final approval or within a further period of an additional three years which may be granted by the township committee. Since the question is not presented to us now, we make no comment on the validity of the ordinance provision in view of the repeal of the statutory authority.

for the reception of further evidence and redetermination in the light of the considerations we have discussed.

One additional argument offered by plaintiffs should be mentioned. They urge that, apart from their view of the legislative provisions, principles of equitable estoppel require the conclusion they seek as to all three development sections. While the point was not expressly raised below, the public nature of the whole case suggests that we should briefly deal with it. We think the point is completely without merit. Insofar as the argument rests on representations said to arise from the granting of tentative approval, it actually does not differ from the question of statutory construction and intent and has been fully disposed of in our discussion of the effect of tentative and final approval. Another aspect of the contention appears to be that the provision in the street ordinance amendment, exempting from the upgraded pavement specifications those streets in which curbs had been installed and the base course laid prior to adoption, is unfair because it does not apply unless a considerable amount of construction of the street has already been completed. However, the specification change affects, according to the record before us, only the layer or layers of the paving above the base course and we can see no such unfairness resulting as might ground an estoppel.

Plaintiffs' principal reliance in this connection is upon the fact that they had expended monies in clearing and preparing the land and commencing the construction of improvements, in varying degrees in different sections, had entered into contracts for paving with penetration macadam and had advertised to the public that houses could be purchased at a price based in part on the cost of such pavement. Although there may be situations where equities of this kind are so strong that an estoppel against municipal action will arise, cf. *Tremarco Corporation v. Garzio*, 32 *N. J.* 448 (1960), such is clearly not the case here. We fail to comprehend how the mere commencement of land preparation could furnish a suitable ground where the installation of pavement

had not been reached. Contracts for paving, even if the evidence were much more persuasive than it is here relative to the existence of a binding obligation in that regard, would seem to be something a developer and his subcontractor enter into at the peril of supervening municipal action which might alter the specifications. And public advertisement of proposed houses at a specific price, is certainly an activity which a developer has no right at all to be protected in prior to final approval for reasons previously fully discussed.[5]

The judgment of the Law Division is affirmed as to the first count of the complaint, reversed as to the second count and reversed and remanded for further proceedings consistent with this opinion as to the third count. No costs to either party.

*For affirmance on first count, reversal on second count and reversal and remandment on third count*—Chief Justice WEINTRAUB, and Justices FRANCIS, HALL, SCHETTINO and HANEMAN—5.

*Opposed*—None.

---

[5] Although the testimony is not entirely clear, we take it plaintiffs are not suggesting they entered into contracts of sale before valid final approval. If such were the case, it would be an *a fortiori* situation against estoppel by virtue of the provisions of *N. J. S. A.* 40:55–1.23. We need not consider the further question whether such contracts would simply be in violation of the punitive provisions of *N. J. S. A.* 40:55–1.23 or would also be completely void, or voidable at the option of the vendee, because contrary to the strong public policy underlying the planning act. *Cf. Markowitz v. Berg*, 125 *N. J. Eq.* 56 (*Ch.* 1939), affirmed 127 *N. J. Eq.* 90 (*E. & A.* 1940); *Samuel D. Wasserman, Inc. v. Klahre*, 24 *N. J. Super.* 143, 148 (*App. Div.* 1952); but see *City of Newark v. Padula*, 26 *N. J. Super.* 251, 261–263 (*App. Div.* 1953).