792 A.2d 544

EUGENE LANDY AND GLORIA LANDY, PATRICK J. MORAN AND ETHEL K. MORAN, STEPHEN A. TYLER AND INGRID D. TYLER, JEFFREY B. LOWN AND MARIS A. LOWN, ALAN FENDRICK AND EVELYN FENDRICK, JAMES DOOLEY AND JANICE DOOLEY, MARC D. GALLIGAN AND MILLIE GALLI-GAN, DONALD J. WHITE AND BETSY WHITE, WILLIAM STATTER AND FRANCES STATTER, MARY ANNE CODD, WALTER J. KAHN AND SUSAN S. KAHN, PLAINTIFFS-AP-PELLANTS, v. HERBERT CAHN AND RUTH CAHN, DEFEN-DANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued January 30, 2002—Decided March 8, 2002.

Before Judges BAIME, FALL and AXELRAD.[1]

*Christopher J. Hanlon* argued the cause for appellants, (*Hanlon & Niemann*, attorneys; *Mr. Hanlon and Neal M. Ruben*, on the brief).

*David C. Apy* argued the cause for respondents, (*McCarter & English*, attorneys; *Mr. Apy*, of counsel, and *Christopher K. Williams*, on the brief).

The opinion of the court was delivered by

FALL, J.A.D.

In this easement dispute action plaintiffs appeal from entry of summary judgment dismissing their complaint. The issues posed in the appeal are whether a valid, enforceable access easement to the Shrewsbury River running in favor of plaintiffs exists across property owned by defendants Herbert and Ruth Cahn by virtue of a deed of easement executed on June 1, 1962 by Dorothy F. Berg and Robert E. Berg, predecessors in title to defendants' property, and filed on May 24, 1965, or whether the purported

---

[1] Judge Axelrad did not participate in the argument but with the consent of all parties, participated in the disposition of the appeal.

easement is void as contrary to public policy or was otherwise extinguished by application of the doctrine of merger.

We conclude that the blanket river-access easement created by the June 1, 1962 deed does not violate the public policy considerations articulated in *Levin v. Township of Livingston*, 35 *N.J.* 500, 173 *A.*2d 391 (1961), nor is it contrary to the terms or conditions of the subdivision approval granted by the municipality. We also rule that the subject easement was not extinguished by application of the doctrine of merger, since there was no unity of title in the dominant and servient estates, nor did the circumstances evidence an intent to extinguish.

Our analysis of these issues requires consideration of the following undisputed facts. In 1957, Edward Folker was the owner of a large tract of undeveloped real property located in the Borough of Rumson between Rumson Road and the Shrewsbury River. The tract became known as "Riverfields Estates."

Folker intended to make application to subdivide the tract in stages, or sections. On August 20, 1957, the Planning Board of the Borough of Rumson (Board) approved the subdivision application of Folker as set forth on a "Map of Riverfields Estates, Section One." The map subdivided Lot 1, Block 65, as shown on the Borough of Rumson Tax Map into seven lots of approximately 1.5 acres each, with frontage along the easterly side of Bingham Avenue. From its intersection with Rumson Road, Bingham Avenue runs in a general southerly direction toward the Shrewsbury River. The seven lots created (lots 5, 6, 7, 8, 9, 10 and 11) begin at the northeasterly intersection of Rumson Road and Bingham Avenue (lot 11) and continue in a southerly direction for approximately 1,906.5 feet along Bingham Avenue, stopping at the southeasterly corner of lot 5, which point is located approximately 1293.5 feet from the Shrewsbury River. The balance of property contained in the Riverfields Estates tract, including the portion of the tract fronting along the Shrewsbury River, remained unsubdivided. The subdivision map was approved by the Governing Body of the Borough of Rumson on August 22, 1957.

On April 21, 1959, Folker and Dorothy M. Folker, his wife, executed a deed conveying lot 10, as shown on the Riverfields Estate, Section One, subdivision map, to Howard J. Poduska and Margaret R. Poduska, husband and wife. Thereafter, that deed was recorded in the Monmouth County Clerk's Office.

On February 3, 1960, the Folkers executed a deed conveying lot 9, as shown on the Riverfields Estate, Section One, subdivision map to Seth P. Johnson and Alma C. Johnson, his wife.

Edward Folker died on July 2, 1961. Dorothea Folker, a/k/a Dorothy M. Folker, died on December 10, 1961. Dorothy F. Berg inherited all lands owned by the Folkers delineated on the Map of Riverfields Estates, Sections One, Two and Three, not previously sold, under the last will and testament of Dorothea Folker, recorded in the Monmouth County Surrogate's Office on December 27, 1961. The Bergs were also the named executors of the Estate of Dorothea Folker.

After the death of Edward Folker, Dorothea Folker, with the assistance of the Bergs, pursued the further subdivision of the remaining Riverfields Estates tract. On August 8, 1961, the Board considered the application of the Estate of Folker for a subdivision entitled "Map of Riverfields Estates, Section Two." This subdivision proposed division of the balance of the Folker tract into building lots. It created lots along the westerly side of Tuxedo Road, which, at its northerly point, also intersects Rumson Road and then runs east of and parallel to Bingham Avenue to a point where both Tuxedo Road and Bingham Avenue are approximately 1293.5 from the river. At that point, Bingham Road curves easterly and Tuxedo Road curves westerly until they meet approximately 700 feet from the river. From that point, Tuxedo Road continues toward the river and ends in a cul-de-sac, approximately 180 feet short of the river. The Section Two subdivision map also reflected "Easement A" and "Easement B." Easement B is twenty feet wide and runs, on Lot 22, from the end of the cul-de-sac to the river. A portion of the language contained on the original Section Two subdivision map filed with the Board describ-

ing Easement B stated that all persons owning or who had been conveyed lots in Riverfields Estates were granted the right "to pass and repass on foot or vehicle" over Lot 22 to the Shrewsbury River.[2]

The Board approved the subdivision. However, the minutes of the August 8, 1961 Board meeting reflect the following relevant discussion pertaining to the description of Easement B on the map:

John Toolan an attorney of Perth Amboy, N.J. appeared in behalf of the Folker Estate as did Mr. Robert Berg.

The Chairman afforded the public present an opportunity to be heard and Dr. Harold Hoops [an owner of a non-Riverfields Estate lot fronting along the westerly side of Bingham Avenue] asked whether or not he would have an easement to the river. Dr. Hoops was advised that the Borough was only interested in an easement for drainage purposes. It was recommended that the wording of easement "B" be changed to give the Borough an easement for drainage purposes only.

Mr. Toolan stated that the developer would enter into an agreement with purchasers of lots in the development and giving them access to the river.

Mr. Jacob White [another owner of a non-Riverfields Estate lot fronting along the westerly side of Bingham Avenue] asked whether or not he had access to the river over the easement and he was advised that he did not.

Mr. Howard Poduska [owner of Riverfields Estate Lot 10 in Section One] asked whether or not he had access to the river and he was advised that an easement agreement would be arranged between the developer and all property owners in the development for access to the river.

. . . .

It was also suggested by the Planning Board that the Borough Council require that the legend concerning easement "B" be changed to give the Borough of Rumson an easement for the maintenance of a drainage pipe only and that private agreements be made between the developer and the purchasers of the individual lots permitting access to the river for the lot owners in this development under this easement.

The Governing Body approved the subdivision at its August 10, 1961 meeting with the notation in the minutes of that meeting "that the Borough Council require that the legend concerning easement 'B' be changed to give the Borough of Rumson an

---

[2] A copy of the original Section Two subdivision map filed with the Board is not contained in the record. This statement is contained in defendants' statement of undisputed material facts submitted in support of defendants' motion for partial summary judgment.

easement for the maintenance of a drainage pipe only and that private agreements be made between the developer and the purchasers of the individual lots permitting access to the river for the lot owners in this development under this easement."

On June 1, 1962, the Bergs executed a deed of easement to the Borough of Rumson and to "all persons who have heretofore or who may hereafter purchase land shown on Map of Riverfields Estates, Sections One, Two or Three; Section One is now on file and Sections Two and Three will hereafter be filed[.]" Pursuant to that deed of easement, the Bergs agreed,

in consideration of the approval of Section One of the Riverfields Estates ... and the hoped for approval of Sections Two and Three of Riverfields Estates ... to carry out and perform the agreement heretofore made between the late Edward Folker and the parties of the second part aforesaid for an easement across certain lands (to be hereafterdescribed) from

Tuxedo Road to the Shrewsbury River, referred to and identified as Easement "B" on Map of Riverfields Estates, Section Two ... dated May 20, 1961, and for an easement ten feet wide from Tuxedo Road to Bingham Road (hereafter more particularly described) and identified as Easement "B".

The "FIRST TRACT" described in the deed of easement is delineated as "a strip of land 20 feet in width from Tuxedo Road to the Shrewsbury River, and identified as Easement "B" on the aforesaid map of Riverfields Estates, Section Two." In addition to granting the Borough of Rumson the right to enter upon the described tract "to maintain, repair or replace a storm sewer to be erected across said respective properties[,]" the deed of easement provided, *inter alia*, as follows:

The grantees above identified (other than the Borough of Rumson), their respective heirs, executors, administrators and assigns, are hereby granted the full and free right and authority, in perpetuity, to pass and repass on foot or by vehicle over the above described First Tract from Tuxedo Road to the Shrewsbury River.

The June 1, 1962 deed of easement was not recorded in the Monmouth County Clerk's Office until May 24, 1965.

On May 22, 1963, the Bergs executed a deed conveying title to lots 8 and 11, as shown on the Map of Riverfields Estates, Section One, to The Pouso Company, Inc. By deed dated December 21, 1963, the Bergs conveyed title to lot 7, as shown on the Map of Riverfields Estates, Section One, to The Pouso Company, Inc.

In 1965, the Bergs applied for final major subdivision approval of the "Map of Riverfields Estates, Section Two." Included in this subdivision map was "Easement B," the twenty-foot wide easement running from the end of the cul-de-sac of Tuxedo Road to the Shrewsbury River, described thereon as:

a portion of Lot # 22; Easement to the Borough of Rumson to maintain a Drainage Storm Sewer to the Shrewsbury River, restricted, forbidding any trees or shrubs to be grown in this Area.

This subdivision application was approved by the Board and Governing Body in July 1965 but was not timely filed. However, the subdivision plan was resubmitted and approved by the Board in March 1966, and approved by the Governing Body at its March 15, 1966 meeting. The approved subdivision map was filed in the Monmouth County Clerk's Office on July 12, 1966.

On June 20, 1966, the Bergs executed a deed conveying title to all fourteen lots contained in the approved major subdivision of Riverfields Estates, Section Two, to Silvermint Homes, Inc. The deed provided, in pertinent part, that title was conveyed:

Subject to covenants, easements, conditions and restrictions appearing of record, if any, provided that the same have not been violated and will not be violated at time of closing, and further provided that the same do not prohibit the use of the premises for development into residential lots.

Subject to a certain easement given by Robert E. Berg and Dorothy F. Berg, husband and wife, to the Borough of Rumson, to construct and maintain a drainage pipe through a portion of Lot 22 on the aforesaid map.

On August 10, 1967, Foxwood Estates,[3] a New Jersey Corporation, executed a deed conveying title of Lot 22, as shown on the Map of Riverfields Estates, Section Two, to Herbert Cahn and Ruth Cahn, his wife, the defendants herein. The deed provided that the conveyance was made, *inter alia:*

SUBJECT to zoning ordinances, restrictions and easements of record, such state of facts as an accurate survey may disclose, and possible added taxes for the current year, to be apportioned.

Beginning in or about 1987, a conflict arose between plaintiffs Eugene Landy and Gloria Landy and defendants concerning the

---

[3] Foxwood Estates was formerly known as Silvermint Homes, Inc.

interpretation and use of the "Easement B" area in accordance with the June 1, 1962 deed of easement. Numerous disputes, confrontations and correspondence culminated in the execution by defendants of a "Declaration of Easement Invalidity" on April 24, 1998, under which the defendants declared that the river rights to "all persons who purchased certain land shown on Sections One, Two and Three of Riverfield Estates," purportedly created by the June 1, 1962 deed of easement, were "null and void and of no effect with respect to Sections 1, 2 and 3 of Riverfields Estates[.]" The Declaration of Easement Invalidity recited that

the Borough of Rumson as a condition of [subdivision] approval required, instead of [the] Purported Easement as contained in the Blanket Deed, that if private "river rights" were to be created for owners of lots in the subdivision, that "private agreements be made between the developer and the purchasers of the individual lots permitting access to the river[.]"

The Declaration went on to assert that since "no private agreements were ever entered into between the Owners, or any prior owners of the Property, granting river rights to any person or entity through, over or across the Property[,]" the purported easement to the Riverfields Estates owners contained in the 1962 deed of easement were null and void.

Before and during the ensuing litigation defendants obtained several affidavits in support of their position. An affidavit was executed by Robert E. Berg, one of the grantors in the June 1, 1962 deed of easement, on October 19, 1998. In his affidavit, Mr. Berg states that the June 1, 1962 deed was not intended "to create or provide 'river rights' to any owner or future owner of individual lots in Riverfields Estates, other than" Howard J. Poduska and Margaret R. Poduska, purchasers of Lot 10 in Riverfields Estates, Section One, on April 21, 1959. Mr. Berg also asserts he "never entered into any private agreements with any purchasers of the individual lots of Riverfields Estates permitting access to the river through, over or across the land identified on the Map as Lot 22, Block 65A."

On March 11, 1999, an affidavit was executed by Alan Werksman, counsel for Foxwood Estates at the time of its sale of Lot 22

to defendants on August 10, 1967. In his affidavit, Mr. Werksman stated that "[t]o the best of [his] knowledge[,]" Foxwood "never intended to and did not grant any private easement or 'river rights' to any of the purchasers of lots in Riverfields Estates, Section Two."

An affidavit was also executed on March 11, 1999 by Norman Goldstein, vice-president of Foxwood Estates at the time of Foxwood's conveyance of Lot 22 to defendants on August 10, 1967. On behalf of Foxwood, Mr. Goldstein executed the deed transferring title to defendants. In his affidavit, Mr. Goldstein stated "[t]o the best of [his] knowledge," Foxwood Estates "never intended to and did not grant any private easements or 'river rights' to any of the purchasers of lots in Riverfields Estates, Section Two." Mr. Goldstein also stated that at the closing of title of the sale to defendants it was his recollection that he "represented and guaranteed to [defendants] that the *only* persons with the right to pass and repass over Lot Number 22 were officials of the Borough of Rumson to construct and maintain a drainage pipe[.]"

On April 1, 1999, Eugene Landy, Gloria Landy and Pat Moran filed a complaint in the Chancery Division against defendants seeking a determination that the Declaration of Easement Invalidity executed by defendants on April 24, 1998 and filed in the Monmouth County Clerk's Office is void; that the recorded deed of easement executed on June 1, 1962 provides plaintiffs unimpeded access over defendants' property to the Shrewsbury River; and damages for slander of title.

On or about April 16, 1999, an amended complaint was filed adding Stephen A. Tyler and Ingrid D. Tyler, and Jeffrey B. Lown as plaintiffs. On or about January 10, 2000, a second amended complaint was filed adding Ethel K. Moran, Maris A. Lown, Alan Fendrick and Evelyn Fendrick, and James Dooley and Janice Dooley as plaintiffs.

Defendants filed a counterclaim against plaintiffs, seeking a declaration that the June 1, 1962 deed of easement was void and of

no legal force or effect and created no rights of access for plaintiffs to the river. The counterclaim also sought compensation for damage to defendants' property by the acts of Samuel Landy while acting as the guest, agent and representative of plaintiffs Eugene and Gloria Landy.

In answers to interrogatories plaintiff Jeffrey B. Lown asserted that at the closing of his purchase of property in Riverfields Estates from Foxwood Estates, Mr. Goldstein advised him that the conveyance of title included an easement for river access.

Defendants moved for entry of an order granting partial summary judgment in their favor on count one of their counterclaim on the easement issue and dismissing count one of plaintiffs' amended complaint on that issue.

Plaintiffs filed a cross-motion seeking leave to further amend the complaint to add William and Frances Statter as party plaintiffs. The Statters are successors-in-title to Howard J. and Margaret R. Poduska in Lot 10, Section One, of Riverfields Estates. The cross-motion also sought permission to file an amended complaint to add Mary Anne Codd, Marc D. Galligan and Millie Galligan, Donald J. White and Betsy White, and Walter J. Kahn and Susan S. Kahn as plaintiffs.

Additionally, plaintiffs moved for entry of partial summary judgment in their favor on the easement issue.

The motions were argued on September 22, 2000. The trial court entered an order on October 16, 2000, permitting the filing of the requested third amended complaint.

With respect to the summary judgment motions, the trial court issued a written decision dated October 16, 2000. The court concluded that to the extent it purported to create an easement from Tuxedo Road to the Shrewsbury River over Lot 22 in favor of the owners of lots in Riverfields Estates, the June 1, 1962 deed of easement, recorded on May 24, 1965, was of no legal effect. The court found that since "Rumson rejected the proposed easement on the map and indicated any easements for river access

could occur only upon 'private agreements ... between the developer and the purchasers of the individual lots permitting access to the river[,]' " the filing of the deed was contrary to public policy as set forth in *Levin, supra,* 35 *N.J.* at 508, 173 *A.*2d 391, requiring local government approval. The trial court also concluded that the subject easement, if not void for public policy reasons, was extinguished through application of the doctrine of merger, because title to both the dominant and servient tenements became united in one owner, and the easement "no longer serves any purpose."

A second order was entered on October 16, 2000, granting defendants' motion for summary judgment, dismissing count one of the amended complaint and entering judgment in favor of defendants on count one of their counterclaim; plaintiffs' motion for partial summary judgment was denied.

On November 14, 2000, a consent order was entered dismissing, without prejudice, the second count of defendants' counterclaim "subject to automatic reinstatement in the event that this matter is remanded to the trial court as a result of any appeal[.]"

On December 1, 2000, the trial court entered an order further memorializing the rulings contained in the two October 16, 2000 orders and the November 14, 2000 order. The December 1, 2000 order also dismissed, with prejudice, count two of plaintiffs' amended complaint, and directed that the order be recorded.

On appeal, plaintiffs argue the trial court erred in concluding that the deed purporting to create an easement from Tuxedo Road to the Shrewsbury River in favor of all owners of lots in Riverfields Estates was contrary to public policy, and erred in concluding the easement was extinguished through application of the doctrine of merger.

I

We first address the public policy issue. The trial court concluded that absent specific private agreements with the developer permitting access to the river, the plaintiffs were not entitled to

any river access across defendants' property. The court relied on the ruling in *Levin, supra*, 35 *N.J.* at 507–08, 173 *A.*2d 391, that held a developer cannot lay out roads and structure lots without municipal approval because it would allow developers to usurp the authority of the municipality to determine the character of the community; therefore, developers are prohibited from filing any plans or deeds that are contrary to the approval of the municipality.

The specific question posed in *Levin, supra*, was whether, "in the course of the planning and construction of a development, do the municipality's specifications for street pavement which it requires the developer to install as an improvement become fixed so that it may not thereafter upgrade them?" 35 *N.J.* at 504, 173 *A.*2d 391. Specifically at issue was whether an amendment to the street ordinance adopted by Livingston Township requiring use of pavement consisting of bituminous concrete, instead of the previously specified penetration macadam, was applicable to a previously-approved subdivision. *Id.* at 505, 173 A.2d 391. The Court considered the issue "in the light of the whole scheme of subdivision regulation prescribed in the state enabling act and its implementation in Livingston by local ordinance[.]" *Id.* at 506, 173 *A.*2d 391. The Court outlined the purposes of municipal control of the subdivision of property, as follows:

> Subdivision control, like zoning, is a tool of overall community planning. They are "closely related * * * in that both are preventive measures intended to avert community blight and deterioration by requiring that new development proceed in defined ways and according to prescribed standards. Zoning relates to the type of building development which can take place on land; subdivision control relates to the way in which the land is divided and made ready for building development." [*Ibid.* (quoting Cunningham, *Control of Land Use in New Jersey Under The 1953 Planning Statutes*, 15 *Rutgers L.Rev.* 1, 45–46, *n.* 175 (1960)).]

In discussing the then-applicable statutes authorizing the municipal regulation of property subdivision, *N.J.S.A.* 40:55–1.14 to 1.29,[4] the Court stated, in pertinent part:

---

[4] These sections were repealed by *L.* 1975, *c.* 291, § 80, *eff.* Aug. 1, 1976. Subdivision regulation is now governed by the provisions of the Municipal Land Use Law, *N.J.S.A.* 40:55D–1 to –92.

The requirements for plat approval provide the means and character of regulation. Under the statute, these fall into two distinct categories, with different attributes. The first, which is mandatory, is broad and relates to layout, design and other basic general terms and conditions. The second, with which we are particularly concerned, is permissive, involving specific tangible "improvements," above and beyond the general terms and conditions, which the municipality may by ordinance compel the developer to install at his expense.

With reference to the first classification, this court said in *Ardolino v. Florham Park Board of Adjustment*, 24 *N.J.* 94, 110, 130 *A.2d* 847 (1957): "It is the obvious intent of the act that in matters requiring the approval of the planning board it should have authority to impose those conditions which in the circumstances it believes are reasonably necessary for the protection of the public good and welfare."

. . . .

The intent [of *N.J.S.A.* 40:55–1.20] to give wide and strong municipal authority is clear. The only precise limitations are found in *N.J.S.A.* 40:55–1.15, requiring that the ordinance contain standards for approving the design of subdivisions and of streets therein and that, where there is a local zoning ordinance, the standards in the subdivision ordinance with respect to minimum lot sizes and lot area requirements be identical with those of the zoning ordinance.

The purposes behind and the scope of the required general terms and conditions are equally plain. At inception the planning board must pass upon basic matters of the highest significance to future community growth and well-being and the welfare of individuals who will ultimately become owners and occupants in the subdivision. . . . For instance, it is of essential importance to determine whether the whole tract proposed to be subdivided is fundamentally suited for the projected development from the standpoint of area, topography, drainage, soil characteristics, accessibility, availability of utilities and the like, or, if not, in whole or in part, whether and to what extent special conditions can be imposed to make it so. . . . It must also decide upon the best layout of lots and streets and whether it conforms to the ordinance design and to the master plan and official map (if the municipality has adopted such). It must consider the impact upon adjacent areas and the effect of other pertinent ordinances of the municipality. Special drainage and sanitary sewage disposal problems may require particular remedies to be undertaken. In certain situations, it may temporarily reserve portions of the tract for schools, parks and playgrounds. In short, at inception the board has the very great responsibility of doing everything possible to avoid future problems of vital importance to the community and subsequent individual property owners.

[*Id.* at 508–11, 173 *A.2d* 391 (other citations omitted).]

The Court found that the Livingston "ordinance provisions were clearly within the scope and intent of the enabling act provisions relating to general 'conditions to be required' and street design standards which must be included in the local legislation." *Id.* at 511, 173 *A.2d* 391. The Court also concluded that the pavement

improvement standards in the adopted ordinance amendment were within the authority of the municipality to "require the developer to install or provide for certain specific improvements, which will become public property and the subject of municipal maintenance in the future and which otherwise the municipality would have to construct at public expense," and "assures the protection of the public interest in this respect and at the same time sufficiently advises the developer of the kind of thing he must install[.]" *Id.* at 514–15, 173 *A.*2d 391. However, the Court concluded that as to the subject subdivision the ordinance amendment was applicable only to those sections that had been given tentative subdivision approval. *Id.* at 516–17, 173 *A.*2d 391.

The question presented here is whether the filing of a blanket deed by the Bergs creating the river-access easements violated the principles set out in *Levin, supra.* More specifically framed, was the grant of blanket easement by the Bergs as contained in the June 1, 1962 deed of easement subject to municipal approval in the context of the subdivision application?

In analyzing these issues, the focus remains the underlying purpose of municipal subdivision regulation. Certainly, it would seem that where the easement is treated the same as a private street, marking the boundary between parcels of property, the creation of the easement is clearly subject to municipal subdivision regulation. Cox, *Zoning and Land Use Administration,* § 16–1 (Gann, 2001); *see also Menlo Park Plaza v. Woodbridge,* 316 *N.J.Super.* 451, 459, 720 *A.*2d 626 (App.Div.1998) (holding that when it is proposed that a roadway be cut through a lot leaving two slivers of land on either side, that is a division of land subject to municipal regulation), *certif. denied,* 160 *N.J.* 88, 733 *A.*2d 493 (1999).

As the Court noted in *Levin, supra,* subdivision regulation is a tool of overall community planning "intended to avert community blight and deterioration by requiring that new development proceed in defined ways and according to prescribed standards." 35 *N.J.* at 506, 173 *A.*2d 391. These purposes and goals are to

regulate the layout, design and other basic general terms and conditions of the division of a tract into lots, and to prescribe standards applicable to the improvement of the lots created, manifested in the form of conditions of any approval that are deemed to be necessary by the approving authority in the public interest. *Id.* at 508–09, 173 *A.*2d 391. Here, the requirement by the Board of a drainage easement is certainly an example of a condition of subdivision approval deemed to be in the public interest.

Unlike in *Levin, supra,* here, the June 1, 1962 deed of easement did not violate any terms or standards set forth by statute or ordinance, nor did it violate the terms of the municipal subdivision approval. To the contrary, we view the Board's action in recommending removing of the river-access language in Easement "B" as a clear expression that the Board did not deem it necessary to regulate the creation of a private river-access easement for the benefit of property owners in the subdivision. *See Hutchinson v. Damin Corp.,* 154 *N.J.Super.* 360, 381 *A.*2d 405 (App.Div.1977), *certif. denied,* 75 *N.J.* 603, 384 *A.*2d 833 (1978)(holding that the creation of simple easements are not subject to municipal subdivision regulation). Here, the Board and the Governing Body specifically stated that the creation of such easements should be through "private agreements ... between the developer and the purchasers of the individual lots permitting access to the river for the lot owners *in this development under this easement."* (Emphasis added). Moreover, it was specifically represented by the developer at the August 8, 1961 Board meeting "that an easement agreement between the developer and all property owners in the development for access to the river[ ]" would be entered into. We view the manifestation of that intent to be the blanket easement provision contained in the June 1, 1962 deed of easement. We conclude that the execution and filing of that deed did not violate the terms or conditions of the subdivision approval, nor did it violate public policy. The fact that the property owners determined to create the easement through a single blanket grant of

easement as opposed to individual agreements is of no legal significance.

## II

Turning to the extinguishment-by-merger issue, we find the absence of a required element necessary for its application. Specifically, there was no requisite unity of title of the dominant and servient estates subsequent to creation of the easement.

The blanket easement contained in the June 1, 1962 deed of easement was given to "all persons who have heretofore or who may hereafter purchase land shown on the Map of Riverfields Estates, Sections One, Two, or Three[,]"

in consideration of the approval of Section One of Riverfields Estates by the Planning Board and the governing body of the Borough of Rumson and the hoped for approval of Sections Two and Three of Riverfields Estates by said respective bodies, to carry out and perform the agreement heretofore made between the late Edward Folker and [the grantees] aforesaid for an easement across certain lands ... from Tuxedo Road to the Shrewsbury River, referred to and identified as Easement "B" on Map of Riverfields Estates, Section Two[.]

Prior to creation of the easement, the Folkers conveyed title to Lot 10, Section One, to Mr. and Mrs. Poduska on April 21, 1959; on February 3, 1960, the Folkers conveyed title to Lot 9, Section One, to Mr. and Mrs. Johnson; Dorothy F. Berg took title to the remaining Section One lots, as well as the balance of the unsubdivided property in the Riverfields Estates tract, on December 10, 1961, pursuant to the last will and testament of her mother, Dorothea Folker. The blanket easement at issue was created by the Bergs in the June 1, 1962 deed of easement. Title to Lots 8 and 11 in Section One were conveyed by the Bergs to The Poluso Company, Inc. by deed dated May 22, 1963. Title to Lot 7 in Section One was conveyed by the Bergs to The Poluso Company, Inc. by deed dated December 21, 1963. On May 24, 1965, the June 1, 1962 deed of easement was recorded. By deed dated June 20, 1966, the Bergs conveyed title to the fourteen lots contained in Section Two to Silvermint Homes, Inc. Finally, defendants took title to Lot 22 in Section Two from Foxwood Estates by deed

dated August 10, 1967, subject to, *inter alia*, "easements of record."

The June 20, 1966 conveyance of the fourteen lots contained in Section Two of Riverfields Estates tract to Silvermint Homes, Inc. did not merge the dominant and servient estates into a single ownership; *i.e.*, none of the Section One Riverfields Estates lots were the subject of the June 20, 1966 deed. Accordingly, the blanket easement contained in the June 1, 1962 deed of easement was not extinguished through operation of the doctrine of merger. *See Pochinski Realty Assocs. v. Puzio*, 251 *N.J.Super.* 388, 598 *A.*2d 523 (App.Div.1991) (declining to apply the doctrine of merger where the owner did not exclusively own both properties).

In addition to a lack of unity of title, precluding application of the doctrine of merger, we further note that, as to the fourteen Section Two lots, the easement was clearly created by the owner of the dominant and servient estates for the benefit of those lots and in anticipation of their sale and conveyance. When all fourteen Section Two lots were conveyed by the Bergs to Silvermint, Inc. on June 20, 1966, the blanket easement was of record, and the Bergs' deed of conveyance was subject to, *inter alia*, "easements ... appearing of record[.]" There was no severance of the dominant and servient estates of the easement by that conveyance. The intent of Silvermint Homes, Inc., later known as Foxwood Estates, was, like the Bergs, to sell and convey all fourteen Section Two lots. Moreover, Silvermint Homes, Inc./Foxwood Estates took no action to cancel or void the easement of record. Foxwood Estates then conveyed Lot 22, Section Two, to defendants, encumbered by the easement. These circumstances do not give rise to application of the doctrine of merger to extinguish the blanket easement contained in the June 1, 1962 deed of easement.

Reversed and remanded for entry of summary judgment in favor of plaintiffs on count one of the amended complaint.